Richard **SUHRE**, Plaintiff,

v.

**HAYWOOD COUNTY, NORTH CAROLINA**, Defendant.

No. Civ. 1:94CV179.

United States District Court, W.D. North Carolina, Asheville Division.

April 2, 1999.

George Daly, Charlotte, NC, for Richard Suhre, plaintiff.

Gregory D. Smith, Clarksville, TN, for The Rutherford Institute, interested party.

Beverly L. Rubin, Moore & Van Allen, Charlotte, NC, for Haywood County, N.C., defendant.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** came on for trial before the undersigned on July 14, 1998. For the reasons set forth below, the Court finds for the Defendant.

## I. OPENING

In September 1932, the residents of Haywood County, a progressive rural county in Western North Carolina, gathered to dedicate their new courthouse which had taken over a year to construct. **Defendant's Exhibit 106, Program of the Dedication of Haywood County Court House, at 1, 7.** In the ensuing dedication ceremony, the courthouse was referred to as the County's "temple of justice," a granite structure reflecting the citizenry's pride at the journey from their original courthouse built of logs some 120 years earlier. *Id.* Of particular pride was the main courtroom on the back wall of which was sculpted "the Decalogue, which now forms

the basis of the Judicial Code of every civilized nation on earth, and the blind Goddess of Justice," now called Lady Justice. *Id.,* at 13. Indeed, great effort was taken to recount the historical development of law, including the ancient mythical gods and goddesses, and the laws of Rome and the Tribes of Israel. *Id.,* at 13–15.

The mythology of [ ] Greece and Rome teaches us that this Goddess of Justice [was] blind when she poised her scales; blind to hatred, revenge and vengeance; blind to passion, prejudice and partisanship; blind to everything except those things that pointed unerringly to the everlasting truth. And I believe that this figure, built in as a part of our Court House, illustrating as it does the historical truth that centuries before Moses and the Decalogue were ever heard of—that even then men loved and worshiped Justice as an attribute of Divinity, will likewise aid in the administration of justice because it teaches that in all ages and in every clime the idea of justice is inherent in the heart of man.

*Id.,* at 16.

In the same year the citizens of this rural community proudly dedicated their courthouse, Adolph Weinman, a noted architectural sculptor, designed two friezes to be placed on the north and south walls of the United States Supreme Court. **Plaintiff's Exhibit 10.** The south wall frieze contains, among other ancient lawgivers, a sculpture of Moses holding the Ten Commandments. *Id.*

For the past 67 years, the 6 foot, 6 inch sculptured form of Lady Justice has welcomed all who came into the main courtroom of the Haywood County Courthouse, holding her Scales of Justice in one hand and her 3–foot–long Sword of Justice in the other. **Defendant's Response to Court's *Sua Sponte* Request for Certain Evidence Not Introduced into the Record at Trial.** On either side of her are marble plaques measuring 1 foot, 8 inches wide by 2 feet, 7 inches high, and on which are contained the Decalogue, commonly

referred to as the Ten Commandments, in lettering which is 1 inch high. *Id.* This case is about whether those marble plaques, "in the administration of justice because ... in all ages and in every clime the idea of justice is inherent in the heart of man," must be removed from the courtroom.

## II. PROCEDURAL HISTORY

In 1994, Richard Suhre (Suhre) began this action for the removal of the marble plaques, contending the display violates the Establishment Clause of the First Amendment. Suhre originally sued the County officials as well the County, but this Court dismissed the action as to all Defendants on the ground of legislative immunity. *Suhre v. Board of Comm'rs,* 894 F.Supp. 927 (W.D.N.C.1995). After that ruling and while the case was on appeal, the Fourth Circuit entered its decision in *Berkley v. Common Council of City of Charleston,* 63 F.3d 295 (4th Cir.1995), by virtue of which the Circuit reversed and remanded as to the County, but affirmed dismissal of the other Defendants. *Suhre v. Board of Comm'rs,* No. 95–2474 (4th Cir. Dec. 28, 1995).

Following remand, the parties conducted extensive discovery at the conclusion of which the County moved for summary judgment claiming Suhre lacked standing to bring the action. This Court agreed and granted the motion for summary judgment. Suhre appealed a second time and the Circuit, finding he had established standing, reversed and remanded for trial. *Suhre v. Haywood County,* 131 F.3d 1083 (4th Cir.1997).

## III. FINDINGS OF FACT

The setting of the display on the wall of the main courtroom of the Haywood County Courthouse is obviously a public area. The display, partially visible from any seat in the courtroom or jury box, is directly behind the judge's bench and consists of two main fluted columns, an entablature,

an arch containing a large clock, the United States and North Carolina flags on either side of the total display, and the towering bas relief of "Lady Justice" centered in the display, blindfolded and holding the scales of justice in one hand and supporting a sword in the other. **Plaintiff's Exhibit 2.** On each side of the figure of Lady Justice is a marble plaque containing an abridged version of the Ten Commandments. *Id.* The scales of justice are directly above one plaque; Lady Justice's right arm and sword are next to the other. *Id.*

The courtroom itself is 51 feet deep by 68 feet wide with a 20 foot ceiling.[1] **Defendant's Response.** There are two public entrances to the courtroom, each of which is almost 55 feet from the display. *Id.* The display, including the outer columns, is 22 feet wide and 18 feet high. *Id.* The flags which flank the display on either side are 13 feet high. *Id.* Almost 4 feet above Lady Justice's head is a clock measuring 15 inches in diameter located within an arch almost 10 feet wide and 17 feet high. *Id.* The front of the jury box is 12 feet from the display; the first row of spectator seating is almost 25 feet from the display. *Id.*

The text displayed on the plaques in one inch high lettering is:

I  Thou shall have no other God before me.

II  Thou shalt not make unto thee any graven image.

III  Thou shalt not take the name of the lord thy god in vain.

IV  Remember the sabbath day to keep it holy.

V  Honor thy father and thy mother.

VI  Thou shalt not kill.

VII  Thou shalt not commit adultery.

VIII  Thou shalt not steal.

IX  Thou shalt not bear false witness.

X  Thou shalt not covet.

1.  The exact dimensions have been rounded.

**Plaintiff's Exhibit 11.** Thus, in a 68–foot–wide courtroom, the total display consumes 22 feet and within this display is an abridged version of the Ten Commandments in one inch lettering on plaques about one and a half feet wide.

The historical context of the display is obvious from the remarks given at the 1932 dedication of the courthouse. "[T]his is your Temple of Justice.... Bear in mind at all times that you should be as fair in your dealings with each other as the blind Goddess who stands there, always being guided by the Ten Commandments as your code of law...." **Speech of W.H. Henderson** *contained in* **Defendant's Exhibit 106.** Felix E. Alley, later a North Carolina Superior Court Judge, made the following remarks at the ceremony:

[J]ust above the Judge's stand, you will see the picture of a woman ... This same picture is on my license to practice law issued by the Supreme Court of the United States and the Supreme Court of North Carolina and of other States ... this same picture of this beautiful woman, standing on a pedestal, holding in her right hand the sword of authority, while in the left hand she holds poised a pair of scales emblematic of the Scales of Justice. It is a picture of the blind Goddess of Justice, worshipped in ancient times by pagans who had no knowledge of the Christian's God, but who believed that this Goddess of Justice presided in the souls of the Judges who held in their hands the lives and liberties and property rights of those whose causes they were called upon to determine and to decide. The mythology of Greece and Rome teaches us that this Goddess of Justice [was] blind when she poised her scales; blind to hatred, revenge and vengeance; blind to passion, prejudice and partisanship; blind to everything except those things that pointed unerringly to the everlasting truth.

**Speech of Felix E. Alley,** *contained in* **Defendant's Exhibit 106.**

In 1972, the Haywood County Courthouse, including the display, was entered on the National Register of Historic Places by the United States Department of Interior. As such, it was recognized as a property "significant in American history, architecture, archaeology and culture—a comprehensive index of the significant physical evidences of our national patrimony." Properties so listed "deserve[ ] to be preserved by their owners as part of the cultural heritage of our nation." **Defendant's Exhibit 101.** In this regard, William Dechant, an architect familiar with the courthouse, testified during the trial that the marble plaques are embedded into the plaster of the wall by mortar. He was unable to slide a knife between the plaques and the wall. His examination of the plaques disclosed cracks in each corner thereof, indicating the wall plaster was applied after the plaques were placed on the wall. Dechant, who was unable to locate the original drawings, further testified that the bolts on the plaques are merely decorative and do not hold them to the wall. It also appears that Lady Justice, who is formed from the same plaster as the wall, was made after the plaques were put into place. If the plaques were removed, there would be injury to the remainder of the display and any asbestos in the plaster would be disrupted.

Into this setting we must now place Richard Suhre, an avowed atheist who moved to Haywood County from New Jersey in 1975 when he retired. **Defendant's Exhibit 112, Deposition of Richard Suhre, at 57.** Suhre openly acknowledges his religious beliefs, or lack thereof, testifying that during his career as an engineer he was forced to remain silent (he does not say by whom or in what manner), "[b]ut when I retired I made a promise to myself that I would not shrink from being an atheist." *Id.,* at 25. To that end, Suhre has, by his own admission, been vociferous. *Id.* His letters to the local newspaper were so numerous that the editor finally stopped publishing them, at which point Suhre stood in front of the newspaper's building and handed out letters to the public. *Id.* According to Suhre, his stature as an atheist rendered him a "person [sic] non grata. You become—you become a pariah." *Id.,* at 64. In addition to his letters to the editor, Suhre "reminded the School Board" it was illegal to have prayer at football games. *Id.,* at 67. He complained to the County Commissioners about the presence of chaplains in the county hospital. **Transcript of Trial Testimony of Richard Suhre, at 11.** And, he wrote to the County Commissioners in 1992 asking that the marble plaques in the courtroom be removed based on a decision in Charlotte holding that Judge Constangy could not open court with a prayer. **Suhre Deposition, at 66.**

Nor has Mr. Suhre enjoyed smooth relationships with his neighbors. He has had a longstanding dispute over barking dogs and the County's failure to enforce its noise ordinance. He has sued one of his neighbors on four separate occasions for violations of the noise ordinance. *Id.,* at 39–41. He sued another neighbor whose dogs barked, resulting in the owner having the animals' vocal cords severed so they were no longer able to bark, *Id.,* at 42–43. In 1990 Suhre was convicted of disturbing a public meeting when he barked at the County Commissioners because no one would recognize him to speak about the dog barking ordinance. *Id.,* at 6–7, 10–11. His conviction for this misdemeanor occurred in a courtroom other the one at issue. In 1991, Suhre sued a third neighbor because his dog barked but the authorities failed to enforce the ordinance. *Id.,* 16–17. "So I made up my mind that I would telephone the [neighbor] every time a dog—a dog barked because they annoyed me . . . . And I did that maybe a hundred times." *Id.,* at 18. As a result, he was convicted of telephone harassment in the courtroom at issue. *Id.,* at 18–19. However, before his trial, he wrote the judges presiding in Haywood County and

accused them of a conspiracy because in the past 14 years only one person was convicted of violating the noise ordinance due to dog barking. *Id., at 19.* Nonetheless, Suhre does not attribute this conviction to the presence of the Ten Commandments on the wall of the courtroom. "I want to say this for all three of the judges, dog barking, you don't have a chance. In other words, dog owners vote and that's the story." *Id., at 28.* He acknowledged it was more likely he would have been convicted whether or not the Commandments were in the courtroom. *Id., at 30–31.* Thereafter, Suhre appealed this conviction to superior court where he was again convicted, this time by a jury. Contrary to his contention in this suit that he was convicted because he is an atheist, Suhre admits the jury could have convicted him because it found making 100 telephone calls to his neighbor constituted harassment. *Id., at 101.* Thus, it is far from clear whether Suhre's primary purpose in filing this action is purging the courtroom walls or harassing the conspiratorial judges, County officials, and his neighbors.

Despite Suhre's penchant for vexing County authorities and his neighbors, he nonetheless has standing to contest the presence of the marble plaques in the main courtroom. Suhre is both appalled and repulsed at the presence of the Ten Commandments in the courtroom because "they have the laws of Moses on the wall prominently displayed where the laws of North Carolina are being adjudicated and they do not mesh." **Trial Testimony of Suhre, at 7.** Those laws, in his opinion, are more prominently displayed than the law of the State of North Carolina. *Id.* He is also offended by the witness oath which ends in the phrase, "so help me God." *Id., at 10.* And, he was equally offended when at the trial of this matter the United States Marshal opened court by stating "God save these United States." *Id.*

At trial, Suhre presented the testimony of Reverends W.W. Finlator and R. Eugene Owens, neither of whom were offered as experts. When asked to view a photograph of the display at issue, Rev. Finlator testified that the first thing he noticed "is the beautiful lady" and then the marble plaques which he "unquestionably" recognized as the Christian version of the Ten Commandments. In his opinion, most Southerners would perceive these plaques as the Ten Commandments. Although he noted that the biblical text uses the word "gods," instead of the singular "god," Rev. Finlator felt the primary effect of the entire display was religious. Nonetheless, he acknowledged it would be difficult for him to say how the average person would perceive the presence of the Ten Commandments in the courtroom. And, he stated the Ten Commandments have become much like the phrase "In God We Trust" on the dollar bill or in the Pledge of Allegiance. But for him and others, the display is a sign of entanglement of the church and state. Rev. Finlator admitted that because of his strong belief in the separation of church and state, the display might offend him more than the average person.[2]

Rev. Owens, who is a retired Baptist minister, also testified that the first thing he noticed in the display is Lady Justice. In his opinion, the plaques are immediately recognizable as the Ten Commandments although he has never compared the various versions thereof. He felt the purpose of the display was an endorsement of the heritage of the people who decided to place it in the courtroom; people who wanted to honor God which amounts to proselytizing. In his opinion, the first four Commandments are religious in nature and the remainder are ethical and moral, *i.e.,* how one should live. Southerners are more likely to perceive the display as religious because of their familiarity with the Bible.

2. The Reverend Dr. Finlator is an outstanding minister, teacher, theologian and civil rights leader whose tireless work and influence for good are virtually unparalleled in the modern history of North Carolina.

"These Commandments were written by the finger of God on tablets of stone," and, in Rev. Owens' mind, it is impossible to be more religious than that. Nonetheless, Rev. Owens stated that the Ten Commandments have become so popular and so well known that they would be immediately recognizable to most citizens. He has a personal bias against the Ten Commandments because they amount to a legalization of religion. And, he acknowledged that the context of the display, which he has never seen in person, would affect the perception of the viewer. Like Rev. Finlator, Rev. Owens felt his strong beliefs concerning the trivialization of religion impact his perception of the display.

Plaintiff also called the owner of a local hardware store and long-time County resident, John Wadham, as a witness. Wadham testified that the display shows the guidelines of the law given to Moses and Lady Justice, an overview of justice. In his opinion, the display is not religious but relates to rules and regulations; and, he noted, the first courtrooms were housed in churches.

Jack Rice, a lifelong County resident, was also called as a witness by Suhre. When he looked at a photograph of the display, he noted that he could not read the writing on the plaques. In his opinion, the display makes the statement that the judicial system will try to do justice for all people. Although there are religious overtones, he did not believe the display was totally religious in purpose. Robert Forga has resided in Haywood County for all of his 71 years. He noted the Ten Commandments are clearly the word of God, but testified the display was placed in the courtroom to show that this is where justice occurs, not for a religious purpose. Mr. Forga also noted the historical context of the display. Three other witnesses called by the Plaintiff all testified that the display as a whole does not convey a religious meaning. Each of them noted the historical component of the Ten Commandments as the basis for our secular law. The Plaintiff introduced no other evidence.

The Defendant called as an expert witness, Dr. Walter Harrelson, a retired professor and biblical scholar who continues to lecture frequently. Plaintiff's witness, Rev. Owens, acknowledged Dr. Harrelson as a biblical scholar. His achievements are far too numerous to list here. However, it is appropriate to point out several relevant ones. Dr. Harrelson, a North Carolina native, was one of the first Americans to study the Dead Sea Scrolls after their discovery in 1947. He speaks four languages and reads eight to ten. For a year and a half, he was the rector for the Ecumenical Institute for Theological Research which was established by Pope Paul the Sixth. He was the vice chair of the committee which published the New Revised Standard Version of the Bible in 1989, the first revision of the Bible since the King James Version was published in 1611. As a result of his studies of the Dead Sea Scrolls, he was responsible for the discovery and addition of four sentences to the Book of Samuel. **Transcript of Trial Testimony of Walter Harrelson, at 14–15.**

On admonition from defense counsel to be truthful, Dr. Harrelson was forced to place his modesty aside and admit no one has written more extensively about the Ten Commandments than he. He has testified in three cases in federal court.

On *voir dire* by Plaintiff's counsel, Dr. Harrelson also admitted extensive contact with Western North Carolina and its people. When asked if he has any expertise in the legislative purpose of the display at issue, Dr. Harrelson testified:

A: I claim to know a great deal about the history of law. I have studied laws from Sumerian times to Babylonian times to Assyrian times to Hittite times to Egyptian times. I know the laws of Israel, the laws of-to some degree, the laws of Rome and of Greece and have worked a great deal on the question of how law affects life

and public policy. And in my own lifetime, which is a rather long one now, I have certainly learned a good deal about the ways in which public displays affect human sensibility and human guidance in their moral life. And so I would not count myself ignorant of the likely impact of a display like that on the walls of Haywood County.... [I]f one wants to particularize my knowledge of the history and contemporary impact of law and public representations of law, then I think I am not just a layperson in that regard.

Q: But do you claim to be an expert on the issue of the principal or primary effect of the display in Haywood County?

A: I do.

Q: Do you claim to be an expert on the question of entanglement of church and state?

A: I am more of an expert than most.

*Id.,* at 20–22. The Court accepted Dr. Harrelson as an expert in the field of the Ten Commandments and the perception thereof of various groups within the country.

Dr. Harrelson testified that the Ten Commandments began in the 13th Century B.C. as "short, pithy, negative statements" which in effect told the ancient Hebrews not to do certain things. *Id.,* at 24–25. Originally they were oral and simply passed around from family to family. Eventually they were reduced to writing in the Hebrew language. These Commandments did not constitute the entire legal materials for the ancient Jews; in fact, the first five books of the Bible, called the Torah by the Jews, contain their collections of laws. And, "[t]he laws of Exodus that follow the Ten Commandments include some that are clear restatements of laws from the Code of Hammurabi in the 18th Century [B.C.], and maybe late 17th Century [B.C.]." *Id.,* at 29. The Ten Commandments have been translated into over one thousand languages; there are over a dozen versions in the English language alone. *Id.,* at 31.

Dr. Harrelson compared the versions of the Ten Commandments involved in *Harvey v. Cobb County* [811 F.Supp. 669 (N.D.Ga.1993), *aff'd,* 15 F.3d 1097 (11th Cir.1994) ] and *State of Colorado v. Freedom From Religion Foundation, Inc.* [898 P.2d 1013 (Colo.1995) ] with the version on the wall of the Haywood County Courthouse. *See,* **Defendant's Exhibit 125–A.**

I see that [version in Haywood County] as one that is not aiming at a religious statement at all. It does, of course, have the word "God." It has the word "Lord" once, but it is such an abbreviation [of the commandments] that it seems to me that it's doing exactly what I take to be the original Ten Commandments were striving to do; and that is, to present the Commandments in a form that makes them suitable for memorization and for spreading their import, moral import, in public life. So I would take this to be certainly the least religious of the group and I would think of it as a nonreligious text.

*Id.,* at 37–38. He further testified that the language on the wall of the courthouse is not from any known religion, although it is an abridgement of the Ten Commandments.

It is not entirely religious. It is language that aims at the presentation of the guidelines of a community for its public life. Some of the matters certainly are tied more closely to the religious tradition than others are, but all of it aims at, in my judgment, at presentation of the moral judgments that are there, the legal guidance that they provide for the public community.... And the language is here connected with the God [sic], the Goddess Justicia who can be called in Greek and is called in some Greek texts, Thetis. It's an effort to present representations of lawgivers who have provided guidance for the community in the hallowed tradition of

the law. And that's why it's there, I believe. And one can see that in the speeches at the dedication.

*Id.,* at 43–44. For example, the speech of Felix Alley recounted the laws of Rome, Greece and the Code of Justinian as the foundations of law in addition to the Hebrew laws. As did Revs. Finlator and Owens, Dr. Harrelson testified that the first thing he noticed in a photograph of the display was Lady Justice.

You see, what's happened is—thank God that it's happened—good numbers of our traditions have so become a part of public life that they now exercise their influence alongside of deeply held religious views without necessarily being themselves any longer the supporting fruit of those religious views. They have become a part of public life. They, to be sure, for devout religious believers carry a religious connotation. But the Ten Commandments have now become a part of public life, and it's in that sense that one wants to say they are secular.

*Id.,* at 47–48. When asked on what basis he concluded that American society adheres to his theory that the Commandments have become a part of public life, Dr. Harrelson testified:

My talks that I've given, which number in the hundreds, have been followed on most occasions by extended comment and conversation with persons who have said, this way of reading the Ten Commandments in which I will have said something like, for example, you shall honor your parents means honor your aging parents, and represents now a text that is concerned with the value of human life as such, have said over and over again that such an interpretation is immensely helpful to them. And they have understood this to be a way by which their own life is illuminated not on the basis of the attribution of the Commandments to Moses or their being in the Bible but on the basis of the way in which the Commandments as a public moral statement illuminate their own life

and guides their own conduct. And I've heard that over and over again. It's to be sure that [ ] is anecdotal, but anecdotes over time add up to something close to what scientific surveys add up to.... [T]his is an abridgment of material out of the Jewish heritage and I see no reason why Jews should take offense.... [Muslims as well have a form of the Ten Commandments] [n]ot in a full collection but the commandments are there, some in the Koran itself and some in the hadith that comments on the Koran. [There is no reason why one of the Islamic faith should be offended by what is on the wall.]

*Id.,* at 53–55.

Other portions of the Bible have also become a part of public life, such as "love your neighbor," portions of Proverbs, the Beatitudes, and the Book of Romans. As a part of public life, the influence of such phrases is no longer dependent on one's religious views, but is "there day by day for persons who do not believe in God, for persons who believe moderately in God, for persons who believe nothing but in God." *Id.,* at 49. They influence the lives of numerous persons not as Commandments, but as a public moral statement guiding their conduct. *Id.,* at 54. In Dr. Harrelson's opinion, the average person in Haywood County viewing the display would perceive it as having a religious flavor and therefore as not entirely religious. *Id.,* at 52–53. The first Commandment does not command people to worship God. Jews, Muslims, those of Islamic faith, or even an atheist, should not be offended by the reference to God. " 'Thou shall have no other God before me' ... would ... be rendered perfectly adequately by, if one believes in God at all[,] one should believe in one God." *Id.,* at 56.

Dr. Harrelson also reviewed Plaintiff's Exhibit 10 which includes a photograph of a frieze on the south wall of the courtroom of the United States Supreme Court. The photograph shows a man with a beard in a flowing robe holding a tablet. Dr. Harrel-

son testified that the writing on the tablets is Hebrew and translated it as "Thou shalt not kill," "Thou shalt not commit adultery," "Thou shalt not steal," and "Thou shalt not bear false witness." *Id.*, at 59. They each have secular parallels in the law. *Id.*, at 61. Included within Exhibit 10 is a Fact Sheet for the south wall frieze from the Office of the Curator of the Supreme Court in which it is stated the architect for the building selected Adolph Weinman, a noted sculptor, to design the friezes. The architect "relied on him to choose the subjects and figures that best reflected the function of the Supreme Court building. Faithful to classical sources and drawing from many civilizations, Weinman designed a procession of 'great lawgivers of history' to portray the development of law." **Plaintiff's Exhibit 10.** "Included among the great lawgivers" are Menes, an Egyptian king and lawgiver; Hammurabi, the Babylonian king who developed the Code of Hammurabi; Moses and Solomon, both described as Israelite lawgivers and judges; Lycurgus, a Spartan legislator; and Solon, an Athenian lawgiver. *Id.* It is also noted in the Fact Sheet that each frieze in the courtroom "measures 40 feet long by 7 feet, 2 inches high." *Id.*

## IV. DISCUSSION

At issue is whether the Haywood County display violates the Establishment Clause of the First Amendment of the United States Constitution: Congress shall make no law respecting an establishment of religion. "[T]he several States have no greater power to restrain the individual freedoms protected by the First Amendment than does the Congress of the United States." *Wallace v. Jaffree*, 472 U.S. 38, 48–49, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ The test for determining whether a government practice or policy violates the Establishment Clause is articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). To pass constitutional muster under the three-pronged *Lemon* test, the practice must "first ... have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, [it] must not foster 'an excessive government entanglement with religion.' " *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)) (other citations omitted). "Recently, the [Supreme] Court reaffirmed the importance of the 'purpose' prong and concluded that the 'effect' and 'entanglement' prongs rightly comprise a single 'effect' inquiry." *Columbia Union College v. Clarke*, 159 F.3d 151, 157 (4th Cir.1998) (citing *Agostini*, 117 S.Ct. at 2015). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Where the practice in question involves a display, the context or setting as well as the content is important. *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 597, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). The government may neither convey nor attempt to convey " 'that religion or a particular religious belief is favored or preferred.' " *Id.*, at 593, 109 S.Ct. 3086 (citing *Wallace*, 472 U.S. at 70, 105 S.Ct. 2479).

■ "The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring). The "government acts neutrally if it acts for some purpose other than advancing religion." *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 279 (4th Cir.1998) (citing *Rosenberger v. Rector of Univ. of Virginia*, 515 U.S. 819, 839–40, 115 S.Ct.

2510, 132 L.Ed.2d 700 (1995)). And, in "determining whether the [display] has a secular purpose, we note that this first prong of the *Lemon* test is a fairly low hurdle. A legislative enactment has no secular purpose only if 'there [is] no question that the [display] or activity was motivated wholly by religious consideration.' " [3] *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir.1995) (quoting *Lynch*, 465 U.S. at 680, 104 S.Ct. 1355). *Lemon* only requires that at least one secular purpose exist. *Lynch*, 465 U.S. at 681 n. 6, 104 S.Ct. 1355.

■ The remarks presented at the dedication of the Haywood County Courthouse clearly establish that the historical component of the plaques within the display was to honor and respect the development of the judicial system. The plaques were referred to as "the Decalogue, which now forms the basis of the Judicial Code of every civilized nation on earth." "Decalogue" is defined as deriving from the Greek word "dekalogos," "a basic set of rules carrying binding authority." **Webster's Third New International Dictionary Unabridged (1981).** The dedicators called the courthouse the Temple of Justice for the community and referred to Lady Justice as the "blind Goddess of Justice." The Supreme Court has endorsed the historical context in ascertaining the purpose behind displays. *See, e.g., Lynch*, 465 U.S. at 680–81, 104 S.Ct. 1355 ("The City ... has principally taken note of a significant historical religious event long celebrated in the Western World. The creche in the display depicts the his-

torical origins of the traditional event long recognized as a National Holiday.... The display is sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes."). As recently as 1997, the Chief Justice of the United States Supreme Court justified the presence of Muhammad in the north wall frieze in the Courtroom by noting, "[t]he depiction of Muhammad was intended only to recognize him, among many other lawgivers, as an important figure in the history of law; it is not intended as a form of idol worship. It is part of an architectural and aesthetic unit that has been in place more than sixty years." **Defendant's Exhibit 121.** That frieze was designed in the same year the Haywood County Courthouse was dedicated.

Thus, the Defendant clearly had a secular purpose when the display was erected. But that is not the complete answer: it is necessary to "examine both what [Haywood County] intended to communicate in displaying the [plaques] and what message the [County's] display actually conveyed." *Lynch*, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J. concurring). "Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?" *Elewski v. City of Syracuse*, 123 F.3d 51, 53 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998). This question, which collapses the remaining *Lemon* prongs of effect and entanglement into one, is " 'in large part a legal question to be answered on the basis of judicial interpretation of

---

**3.** The Plaintiff's dogged reliance on *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), is perplexing. The Court there held, "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.*, at 41, 101 S.Ct. 192. However, in *Stone*, unlike the case at hand, the commandments were posted alone as the result of a legislative enactment

and were posted not as part of a display. As noted by the Court, "[t]his is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.*, at 42, 101 S.Ct. 192. The remarks made at the 1932 dedication are clearly part of the historical context of the display at issue; they are not a "legislative recitation of a supposed secular purpose," for indeed, in 1932, this lawsuit would not have been anticipated.

social facts.'" *Id.,* at 54 (citing *Lynch,* 465 U.S. at 694, 104 S.Ct. 1355); *Agostini, supra.*

■ At the trial, both of the Plaintiff's "religious" witnesses testified the plaques are religious; but, they both also admitted the first thing they saw when looking at a photograph of the display was the "beautiful lady," referring to Lady Justice. Rev. Finlator admitted he could not opine how the average person would perceive the presence of the plaques. Both Revs. Finlator and Owens admitted the Ten Commandments have become "ceremonial deisms." And, both admitted their own strong convictions to support the separation of church and state impacted their perceptions. Nonetheless, Rev. Owen acknowledged the display is an endorsement of the heritage of the people who put it up. And, Dr. Harrelson testified that in his expert opinion, the average person in Haywood County would not perceive the display as entirely religious; the Ten Commandments have become a part of public life.

In *Lynch,* the holiday display erected by the city government contained a creche among many other secular decorations traditionally associated with Christmas.

> The evident purpose of including the creche in the larger display was not promotion of the religious content of the creche but celebration of the public holiday through its traditional symbols. Celebration of public holidays, which have cultural significance even if they also have religious aspects, is a legitimate secular purpose.... [T]he overall holiday setting changes what viewers may fairly understand to be the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.

*Lynch,* 465 U.S. at 691–92, 104 S.Ct. 1355 (O'Connor, J. concurring). Here, the overall setting of the display, including Lady Justice's overwhelming presence, her scales of justice, her sword of justice, the columns, the clock, the arch and the flags, "changes what viewers may fairly understand to be the purpose of the display" and "negates any message of endorsement of [a religious] content." *Id.*

To that end, Justice Stevens' opinion in *Allegheny,* in which he discussed the frieze on the south wall of the United States Supreme Court, is directly on point.

> Application of a strong presumption against the public use of religious symbols ... will prohibit a display only when its message, evaluated in the context in which it is presented, is nonsecular. For example, a carving of Moses holding *the Ten Commandments, if that is the only adornment on a courtroom wall,* conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law. The addition of carvings depicting Confucius and Mohammed may honor religion, or particular religions, to an extent that the First Amendment does not tolerate any more than it does "the permanent erection of a large Latin cross on the roof of city hall." *Placement of secular figures such as Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall alongside these three religious leaders, however, signals respect not for great proselytizers but for great lawgivers. It would be absurd to exclude such a fitting message from a courtroom,* as it would to exclude religious paintings by Italian Renaissance masters from a public museum.

*Allegheny,* 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part, dissenting in part) (emphasis added). Thus, neither *Lemon* nor its progeny require that all governmental displays be sanitized to erase any reference or allusion to religion. If the marble plaques appeared alone in the Haywood County Courthouse, this would be equivocal at the least. *See Harvey v. Cobb County, supra.* But the fact is that the plaques are the smallest

part of the display which is overwhelmingly dominated by Lady Justice and which contains other secular objects such as the sword of justice and the scales of justice flanked by the American and North Carolina flags. *American Civil Liberties Union of New Jersey ex. rel. Lander v. Schundler,* 168 F.3d 92, 103 (3d Cir.1999) (discussing *Allegheny,* "[Justice Blackmun] noted that the tallest object in the display, the tree, is a secular symbol, and while he recognized that the menorah is a religious symbol, he suggested that it did not in context convey a religious message because of the proximity of the larger tree ...."). This "signals respect" not for religion but for the law. "It would be absurd to exclude such a fitting message from a courtroom." *Allegheny, supra.*

■ Nor does the Plaintiff's personal sensitivity to the presence of the plaques mandate a different result. "A reasonable observer is not one who wears blinders and is frozen in a position focusing solely on the [plaques].... A reasonable observer ... would thus observe [Lady Justice, the sword and scales of justice and the flags.]" *Elewski,* 123 F.3d at 54. A "reasonable observer" is deemed to be " 'aware of the history and context of the community and forum in which the religious display appears.' " *Gaylor v. United States,* 74 F.3d 214, 217 (10th Cir.1996) (quoting *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 779, 115 S.Ct. 2440, 2455, 132 L.Ed.2d 650 (1995) (O'Connor, J. concurring)). Furthermore, the inquiry is " 'not about the perceptions of particular individuals or saving isolated non-adherents from the discomfort of viewing symbols of faith to which they do not subscribe.' " *Id.* (quoting *Capitol Square,* 115 S.Ct. at 2455). The testimony of every witness at the trial, with the exception of Mr. Suhre, showed that the average person viewing the display would not focus on the plaques but on their context within the larger display. *Schundler,* 168 F.3d 92, 106–07 (quoting *Allegheny,* "the history and ubiquity of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.").

These features combine to make the [County's] display of the [plaques] in this particular physical setting no more an endorsement of religion than such governmental "acknowledgments" of religion as legislative prayers of the type approved in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019[ ] (1983), government declaration of Thanksgiving as a public holiday, printing of "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court." Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

*Lynch,* 465 U.S. at 692–93, 104 S.Ct. 1355 (O'Connor, J. concurring). The national motto "In God we trust" has been upheld by three circuit courts. *Gaylor, supra; O'Hair v. Murray,* 588 F.2d 1144 (5th Cir.1979); *Aronow v. United States,* 432 F.2d 242 (9th Cir.1970). This motto is engraved in the House of Representatives and over the entrance to the Senate, not to mention on our coin and currency. *American Civil Liberties Union of Ohio v. Capital Square Review & Advisory Bd.,* 20 F.Supp.2d 1176 (S.D.Oh.1998). Since the tenure of President Washington, Presidents have proclaimed Thanksgiving as a national day of prayer and celebration. *Allegheny,* 492 U.S. at 671, 109 S.Ct. 3086 (Kennedy, J., concurring in part, dissenting in part). Our legislature has not only approved the employment of legislative chaplains for the United States House of

Representatives, United States Senate, and United States Armed Forces (2 U.S.C. § 61d), but has set aside a prayer room for its members' use. *Id.,* at 672, 109 S.Ct. 3086. Other laws have enacted a national day of prayer (36 U.S.C. § 169h), provided that our Pledge of Allegiance to the American flag shall describe our country as "one Nation under God" (36 U.S.C. § 172), and funded the National Gallery of Art which publicly displays religious paintings. *Id.* The final words of the oath of office for the President of the United States are "so help me God." *Lynch,* 465 U.S. at 675–78, 104 S.Ct. 1355.

Whether these examples are considered ceremonial dieisms or governmental practices "grandfathered" under *Lemon,* the display at issue is more secular in nature than any of them. The display touts nothing more than an effort to recall the origin of modern law, by reference to an ancient source of law and justice. The overall, basic message is equal justice before the law.

▪ Nor is there entanglement. "[T]he Establishment Clause was intended to afford protection [against] 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105 (quoting *Walz,* 397 U.S. at 668, 90 S.Ct. 1409). But "[j]udicial caveats against entanglement must recognize that the line of separation, far from being a 'wall' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Id.,* at 614, 91 S.Ct. 2105.

> The concept of a "wall" of separation is a useful figure of speech probably deriving from views of Thomas Jefferson [4] .... But the metaphor itself is not a wholly

accurate description of the practical aspects of the relationship that in fact exists between church and state. No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government. "It has never been thought either possible or desirable to enforce a regime of total separation...." *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 760[, 93 S.Ct. 2955, 37 L.Ed.2d 948] (1973). Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.... Anything less would require the "callous indifference" we have said was never intended by the Establishment Clause.... Indeed, we have observed, such hostility would bring us into "war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion." *McCollum [v. Board of Education,* 333 U.S. 203, 211–12, 68 S.Ct. 461, 92 L.Ed. 649 (1948) ].

*Lynch,* at 673, 104 S.Ct. 1355 (other citations omitted) (footnote added; other footnotes omitted).

"[T]he relevant question for Establishment Clause purposes is whether the ... display ... sends a message of government endorsement of [religion] or whether it sends a message of pluralism and freedom to choose one's own beliefs." *Allegheny,* 492 U.S. at 634, 109 S.Ct. 3086 (O'Connor, J. concurring in part, concurring in judgment). Also, entanglement is a question of "kind and degree." *N.C. Civil Lib-*

---

4. "Nevertheless Jefferson's wall of separation was not so high that it prevented him from supporting religion when it served secular purposes he considered important such as pacifying the Indians or encouraging moral behavior by students at his beloved University of Virginia. As President, he signed laws and treaties which provided public funding to support missionaries and churches in Indian territory, and as Rector of the University of Virginia, a state institution, he promulgated regulations which included the admonition that students were 'expected to attend religious worship.' *See,* Robert L. Cord, *Separation of Church and State: Historical Fact and Current Fiction,"* 38–45 (1982); *The Writings of Thomas Jefferson,* 449 (Memorial Ed.1904). *ACLU of Ohio,* 20 F.Supp.2d at 1184, n. 16.

*erties Union Legal Foundation v. Constangy,* 947 F.2d 1145, 1151–52 (4th Cir. 1991).

The display here involves history, ethics and civilization; it is not the kind or degree with which the Court should be concerned. *School Dist. of Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Nor has there materialized the type of excessive entanglement proscribed by *Lynch, Allegheny,* or *Constangy.* There is no expenditure of state or local funds to support a church or church-related organization. Indeed, there is no governmental involvement with a religious program or authority of any type. There has never been any overt action by a governmental authority, person or program to call attention to the presence of the plaques in the courtroom, much less to promote the Ten Commandments. The display was not erected and is not maintained by any religious organization. No religious faith, denomination or organization is affiliated with or identified as a sponsor of the display. No statute or ordinance mandates its placement; no duplication or dissemination of its contents is suggested by any governmental body. The only government funds involved have been minute for cleaning. There is no constant government monitoring.

This display has enjoyed 67 uninterrupted years on the courthouse wall without evidence of a single act or effort by the County to "coerce anyone to support or participate in any religion or its exercise" or to exhort "religiosity [which] amounts in fact to proselytizing." *Allegheny,* 492 U.S. at 659–60, 109 S.Ct. 3086 (Kennedy, J. concurring in part, dissenting in part). In fact, Plaintiff's angst results more from his own intolerance of the rights of others than a desire to protect his own atheistic convictions. The display has a historic and "secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Lamb's Chapel v. Center Moriches Union Free*

*Sch. Dist.,* 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). It simply "does not create an intimate relationship of the type that suggests unconstitutional entanglement of church and state." *Gaylor,* 74 F.3d at 216. "[T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *School Dist. of Abington Tp., Pa.,* 374 U.S. at 308, 83 S.Ct. 1560 (Goldberg, J. concurring). Nothing more than shadow is involved here.

In sum, the display in the Haywood County Courthouse no more violates the First Amendment than the frieze on the south wall of the Supreme Court. The marble plaques are "part of an architectural and aesthetic unit that has been in place more than sixty years. Altering the depiction of [the plaques] would impair the artistic integrity of the whole. Additionally, it is unlawful to remove or in any way injure an architectural feature in the Supreme Court building." **Defendant's Exhibit 121, Letter from Chief Justice William H. Rehnquist to Mr. Nihad Awad and Mr. Ibrahim Hooper, dated March 11, 1997 (responding to a request that the depiction of Muhammad be removed from the wall of the Supreme Court courtroom and citing 40 U.S.C. § 13i).** And, like the frieze on the wall of the Supreme Court, this display is protected by law. *See,* N.C.Gen.Stat. § 14–147 (**"If any person ... shall knowingly remove, alter or deface any landmark in anywise whatsoever ... such person ... shall be guilty of a Class 2 misdemeanor."**). The Haywood County Courthouse has been placed on the National Register of Historic Places and thus enjoys a protected status. 16 U.S.C. § 470a(c)(4) (**" '[P]rotection means a local review process under State or local law for proposed demolition of, changes to, or other action that may affect historic properties designated [on the Register]);"** N.C.Gen.Stat. § 160A–400.8. "The National Register is an authoritative guide to be used by Federal, State, and local governments, private

groups and citizens to identify the Nation's cultural resources and to indicate what properties should be considered for protection from destruction or impairment." 36 C.F.R. § 60.2. In fact, a property may be removed from the register due to alteration. 36 C.F.R. § 60.15. And, state law provides for legal proceedings to prevent the alteration of historic landmarks. N.C.Gen.Stat. § 160A–400.11 (**"In case any building ... designated as a historic landmark ... is about to be ... materially altered, remodeled ... the city or county, the historic preservation commission or other party aggrieved by such action may institute any appropriate action or proceedings to prevent such unlawful ... alteration, remodeling or removal, to restrain ... such violation or to prevent any illegal act or conduct with respect to such building ....."**).

## V. CONCLUSION

Viewing the display as a whole, a reasonable observer would not see the two plaques as endorsing or inhibiting a particular religious belief or lack thereof. The display is clearly set in a historical, ethical and legal context. While some of the abridged Commandments may be interpreted as reflecting a religious message,

they do not stand alone. The entire text is part of a larger message of their historical significance as part of the emergence of basic laws which remain to this day included in local, state and national codes. When considered in the totality, only a narrow and shrewish interpretation of the display could lead one to conclude that it is an endorsement of Christian or Jewish faith. "The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating against religion." *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet,* 512 U.S. 687, 717, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (O'Connor, J. concurring). The simple acknowledgment of religion is not proscribed. *Lynch,* 465 U.S. at 693, 104 S.Ct. 1355 (O'Connor, J. concurring). The display thus has an historic and "secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141.

## VI. ORDER

For the foregoing reasons, the Plaintiff's action is dismissed by Judgment filed herewith.[5]

5. The Court incorporates herein and attaches hereto Plaintiff's Exhibits 2, 3, and 10(A) for illustrative purposes.

400

PLAINTIFF'S
EXHIBIT
2 1:94cv179

PLAINTIFF'S
EXHIBIT
3

