William A. **BOOKS** and Michael Suetkamp, Plaintiffs,

v.

**CITY OF ELKHART, INDIANA,**
Defendant.

No. 3:98CV0230 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 22, 1999.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, David R. Hoffman, Washington Weisman and Kimmell, South Bend, IN, for William A. Books, Michael Suetkamp, plaintiffs.

Paul D. Eash, City Attorney, City of Elkhart, Elkhart, IN, for City of Elkhart, defendant.

John R. Price, John R. Price and Associates, Indianapolis, IN, for Equal Justice Under Law of Indiana Inc., amicus.

ALLEN SHARP, District Judge.

## I. PROLOGUE

O yez. O yez. O yez. All persons having business before the honorable, the Supreme Court of the United States are invited to draw near and give their attention for the Court is now sitting. God save the United States and this Honorable Court.[1]

## II. MEMORANDUM AND ORDER

In May, 1958, members of the Fraternal Order of the Eagles presented a monument to the City of Elkhart inscribed with, among other things, verses from the book of Exodus in the Old Testament of the Bible commonly called the Ten Commandments. The City accepted the monument and it was placed in an unobtrusive location north of the entrance of City Hall without opposition or complaint. At that time, no one contended that the City's action was unconstitutional. Now, on the basis of what some describe as a "Living Constitution," [2] that action of nearly half a century is being challenged on constitutional grounds.

This cause is currently before the Court on the parties cross motions for summary judgment, and on Defendant's Motion for Oral Argument dated September 7, 1999. The Plaintiffs, William A. Books and Michael Suetkamp, filed a complaint with this Court May 5, 1998 asking for a declaration that the Defendant City of Elkhart's display of a monument of the Ten Commandments on publicly owned property violates the Establishment Clause of the First Amendment to the United States Constitution. The Plaintiffs also asked that the City be permanently enjoined from placing

---

1. Crier's declaration opening sessions of the Supreme Court of the United States.

2. This phrase is commonly associated with Justice Brennan, although it has never been asserted that he actually said it.

the Ten Commandments monument on public property.

The Plaintiffs filed a Motion for Summary Judgment on November 12, 1998. On November 13, 1998, the Defendant filed a Motion for Summary Judgment on the grounds that the Plaintiffs lacked standing to bring suit, and that the presence of the Ten Commandments monument does not constitute an endorsement of religion by the City of Elkhart. Both parties filed a number of additional motions which this Court dismissed by order dated September 27, 1999. Defendant's Motion for Oral Argument is also DENIED. The Court has before it a fully developed record with oral arguments before the Magistrate Judge which is adequate for a decision on these motions. Additional oral arguments would only produce unnecessary delay in a proceeding that has already dragged on for a year and a half. The Court has carefully considered all the submissions of the parties and now rules as follows.

### III. FACTS

The facts in this case are largely undisputed, however, they are essential to a complete understanding and correct determination of this case. Recent Supreme Court decisions under the Establishment Clause have involved a highly fact sensitive, case by case analysis to determine whether a government practice violates the First Amendment to the Constitution. Therefore, this Court will recount the facts with considerable detail for the record.

### A. Background

A large monument containing the text of the Ten Commandments sits outside of the City Municipal Building in Elkhart, Indiana. This monument was given to the City of Elkhart (the "City") in 1958 by the Fraternal Order of Eagles (the "FOE") as part of its National Youth Guidance Program. The Program was initiated by a Minnesota juvenile court judge to address what he discerned to be a need common to many of the youth he encountered in court to have some code of conduct or standards by which to govern their actions. He thought that "they could benefit from exposure to one of mankind's earliest codes of conduct, the Ten Commandments."

The Minnesota judge made clear in his affidavit that his purpose was not to provide religious instruction of any kind, but "to show these youngsters that there were such recognized codes of behavior to guide them." He had the idea of posting a copy of the Ten Commandments in juvenile courtrooms in Minnesota and around the country. To help fund the program, the judge contacted the FOE seeking their support. The FOE is not a religious organization, but rather a service organization dedicated to promoting "Liberty, Truth, Justice, and Equality." Their main mottos are "The Fraternity for the Common Man" and "People Helping Other People."

At first, the idea was rejected by the Eagles because they felt it might be seen as coercive or sectarian. However, after representatives of the Jewish, Protestant, and Catholic faiths worked together to develop a version which "was not identified with any one religious group," the Eagles agreed to support such a youth guidance program.

At this time, the juvenile judge was contacted by motion picture producer Cecille B. DeMille, who was then producing the movie, "The Ten Commandments." Mr. DeMille "thought the program was a wonderful idea," and suggested that something more durable be used for the project like bronze plaques, which could be distributed around the country. Because "the original Ten Commandments were on granite," the judge suggested, and DeMille agreed, that granite monuments would be more suitable. Local chapters, or "aeries," of the FOE paid for the stone monuments and donated them to their local communities. Elkhart Aerie No. 395 dedicated the monument that is the subject matter of the current litigation to the City of Elkhart pursuant to the purposes of the FOE. Many similar monuments were donated to

state and local governments around the country.

## B. The Monument

The Ten Commandments monument is made of granite and is approximately six feet high and three and one-half feet wide. It is sculpted in the form of two tablets. At the top of each tablet is a floral design that surrounds the representation of two other tablets. Inside the small tablets are letters identified by the Plaintiffs' expert as an ancient Hebrew script, but for which he offers no translation. Between the two small tablets is an eye within a pyramid—an "all-seeing eye" similar to that depicted on the one-dollar bill. Immediately below this symbol is an American Eagle grasping an American flag.

The largest portion of the monument is taken up with the text that was put together through the collaborative effort mentioned above. It is written in an old English font and reads as follows:

the Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Though shalt not take the name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which thy Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidser-

vant, nor his cattle, nor anything that is thy neighbors.[3]

Below this text, there are two stars of David, symbols associated with the Jewish religion, similar to the star on the Israeli flag. In the center between the two stars of David are two Greek letters, Chi and Rho, one superimposed upon the other. These are the first two letters in the name "Jesus Christ" and this symbol was developed in the early church and is still seen in some Catholic Churches. At the base of the monument, a small scroll appears with these words:

PRESENTED BY
THE CITY OF ELKHART, IND.
BYELKHART AERIE NO. 395
FRATERNAL ORDER OF EAGLES
MAY, 1958

This inscription is in type that is larger than in the main text of the Ten Commandments, but smaller than the text in the title.

## C. The Context of the Monument

The Municipal Building for the City is in the downtown district and is located on the northwest corner of Second and High Streets. The Municipal Building houses a variety of city offices including the mayor's office, the legal department, the human relations department, the city court, the prosecutor's office, the offices of the court clerk, the city clerk's office, the planning and development office, and the offices of the common council, among others. The City also owns property on two of the other three corners at this intersection which are occupied by the Elkhart Public Library and the County Courts Building.

Most of Municipal Building lot is taken up by the building itself, the sidewalks, and the parking lot. However, the City maintains a grass lawn approximately 25 feet wide between the building and the sidewalks along Second and High Street.

---

3. The text of the monument actually has eleven commandments. It combines the Protestant and the Catholic versions. However, some contemporary Jewish scholars believe that the original Hebrew word is not "kill" but "murder".

On the southeast corner of the lawn, the corner nearest the intersection, is a war memorial composed of two monuments. One was donated by the Daughters of the American Revolution to commemorate Revolutionary War Veteran's buried in Elkhart County. It consists of a large stone with a plaque that states:

"ERECTED BY THE WILLIAM TUFFS CHAPTER Of THE DAUGHTERS Of THE AMERICAN REVOLUTION IN HONOR Of THE REVOLUTIONARY SOLDIERS BURIED IN ELKHART COUNTY. WILLIAMS TUFFS. WALTER DENNY. JOHN PROCTOR. JULY 4, 1932."

Behind the stone is a brick pillar, also with a plaque, that states: "BEHOLD FRIEND, YOU ARE NOW ON HALLOWED GROUND FOR HERE BURNS FREEDOMS HOLY LIGHT" (hereinafter referred to collectively as the "War Memorials"). On the northeast corner, the corner nearest the parking lot, is the larger Ten Commandments monument. Approximately in the center between the two memorials is the main entrance to the Municipal Building. The building also has two other entrances, a public entrance on the south side and one on the northwest side that is primarily used for employees. Over the main entrance to the Municipal Building is a bas relief of an Elk's head flanked on one side by the word "DEDICATVM" and "INCORPORATED 1875" on the other side by the word "JVSTITIAM" and "ERECTED 1915" with the letters "AD" directly above the Elk's head.

The two memorials are approximately the same distance from the entrance, one is forty-six feet, the other forty-eight. They are also about the same distance from the sidewalks, approximately ten feet. The City landscapes both memorials in such a way that from the front they create a balanced effect. Both are partially shaded by trees, and can be seen but not read by a person walking up the sidewalk to the main entrance.

A person walking along the sidewalk towards the intersection could read the text on the Revolutionary War Memorial. A person walking from the main entrance to the parking lot could read the text on the Ten Commandments monument. Both monuments can be seen by a person driving on Second Street, but the text of the Ten Commandments is larger and can be read from further away, with the first two lines visible from approximately sixty feet away. The City maintains numerous other displays of historical significance in and around its public buildings, as well as other memorials dedicated to war veterans, including inside the Municipal Building itself, but none are visible at the same time as the challenged monument.

## D. Procedural History

Plaintiff William Books is a resident of Elkhart who first noticed the Ten Commandments monument around 1990, when he was "driving real slow in a delivery truck." In November, 1997, he wrote a letter to the American Civil Liberties Union (the "ACLU") about the monument. *Books Dep. at 23.* In 1998, the Indiana Civil Liberties Union (the "ICLU") contacted the Mayor on behalf of Books and asked the City to remove the monument or they would file a lawsuit. *Response of Elk at 1.* The City, after considering the request, passed the following resolution:

WHEREAS, the issue of the Ten Commandments Monument outside Elkhart City Hall has been raised by a person who is represented by the Indiana Civil Liberties Union. The Indiana Civil Liberties Union has contacted the Mayor of the City of Elkhart and has stated that a lawsuit will be filed if the Ten Commandment Monument is not removed.

WHEREAS, in recognition of the historical significance of the Ten Commandments, the Fraternal Order of Eagles presented the Ten Commandment monument to the City of Elkhart in May, 1958. In addition to the Ten Commandments, the Monument contains symbols that reflect the cross cultural

and historical significance of the Ten Commandments.

WHEREAS, the Ten Commandments Monument has stood outside in an unobtrusive location to the north of the entrance of City Hall since 1958. There are numerous other historical and cultural plaques, memorials, and monuments located south of the entrance of city hall, in the foyer just inside the city hall entrance, at the first floor open area of city hall, and at the second and third floor open areas of city hall; and

WHEREAS, the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization.

NOW, THEREFORE, BE IT RESOLVED BY THE COMMON COUNCIL OF THE CITY OF ELKHART, INDIANA, THAT:

The Ten Commandments Monument is a historical and cultural monument that reflects one of the earliest codes of human conduct. It is proper for the Ten Commandments Monument to remain and the defense of this position is strongly endorsed.

This resolution was passed and adopted by the Common Council May 4, 1998. As promised, attorneys for Books and Suetkamp, in conjunction with the ICLU, immediately filed this suit in federal district court.

Books states in his affidavit that he must come into direct and unwelcome contact with the monument in order to participate as a citizen of Elkhart, since it is "by the main entrance to the Municipal Building." At times, he must pass the monument to conduct business in the Municipal Building, such as to attend a City Council meeting and to talk to the City Council's Clerk. In addition, Books states that he must pass the monument when driving home from work. Books states that he believes that placing the monument near the entrance of the Municipal Building is an endorsement by government, and that it discriminates against atheists. He states that he does not always look at the monument, but says, "Even if I don't see it, I certainly know it is there. It offends me if I think about it." Books stated that it would be offensive should any acknowledgment of religious history by a governmental entity be given in a display. *Books Dep. at 28.*

Michael Suetkamp has lived in Elkhart approximately six years. He stated in his Deposition that he learned about the lawsuit when he read about the ICLU's demand to the City to remove the Monument. He too is offended by the monument. Suetkamp states that he too must come into direct and unwelcome contact with the monument in order to participate as a citizen of Elkhart. In addition, he says that he must frequently pass the monument in his daily activities, such as when riding his bicycle, going to the library across the street or conducting business in the area. However, he states that he has never altered his route or made any changes in his ordinary routine in order to avoid the monument. He states that he is deeply offended by the monument and believes it to be an illegal endorsement of religion by the City.

Both parties filed motions for summary judgment almost simultaneously in November, 1998. On January 6, 1999, this Court referred the matter to a Magistrate Judge for the purposes of making a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge heard oral arguments on March 12, 1999 and issued a Report and Recommendation on August 16, 1999, finding in favor of the Plaintiffs. The Defendants filed timely objections to the Magistrate's Report and Recommendation on September 7, 1999 pursuant to 28 U.S.C. § 636(b)(1). This Court must now make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. *Id.* The Magistrate Judge's Report deals thoughtfully with the complex issues raised in this case. That concerned people within the Federal Judiciary would come

to different conclusions on the meaning and application of the Religious Clauses in the First Amendment is not uncommon.

### IV. JURISDICTION

This cause of action arises under 42 U.S.C. § 1983. Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), and by 28 U.S.C. § 2201. Injunctive relief is authorized by Rule 65 of the Fed.R.Civ.P. Jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1343, and venue is proper pursuant to 28 U.S.C. §§ 94(a)(3) and 1391.

### V. STANDARD OF REVIEW

Both parties in this action have moved for summary judgment pursuant to Fed. R.Civ.P. 56. The standards a court employs in reviewing a motion for summary judgment are well-established. Summary judgment is proper only if the record shows that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *King v. Preferred Technical Group,* 166 F.3d 887, 890 (7th Cir.1999) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Where cross-motions for summary judgment are involved, the court looks to the burden of proof that each party would bear on the issue at trial, requiring that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Santaella,* 123 F.3d at 461 (7th Cir. 1997). The court extends to each party the benefit of any factual doubt when considering the other's motions. *Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir. 1993). "If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law." *Santaella v. Metropolitan*

*Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997).

### VI. STANDING

 Plaintiffs face numerous hurdles in bringing a successful claim under the Establishment Clause of the Constitution. Not the least of those is whether the Plaintiffs have standing to bring a constitutional challenge to the presence of the Ten Commandments monument in open space on public property. Standing is a threshold question in every federal case because, if the plaintiffs lack standing to raise their claims in federal court, the court is without authority to consider the merits of the claim. *Freedom From Religion Foundation, Inc. v. Zielke,* 845 F.2d 1463, 1467 (7th Cir.1988). Article III, Section 2 of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). "The constitutional power of the federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal right of litigants in actual controversies.' " *Doe v. County of Montgomery, Ill.,* 41 F.3d 1156, 1159 (7th Cir.1994) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)) (citation omitted). While some elements of the doctrine of standing are based on prudential considerations, the core component of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

 The Supreme Court has determined that the "irreducible constitutional minimum of standing" contains three elements. *Steel Co.,* 118 S.Ct. at 1016. First, the Plaintiffs must allege an "injury in fact"—a harm suffered that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical' " *Id.* (citations omitted).

Second, there must be causation—the injury must be fairly traceable to the complained-of conduct of the defendant. *Id.* "And third, there must be redressibility—a likelihood that the requested relief will redress the alleged injury." *Id.*

The psychological harm that results from witnessing behavior with which one disagrees is not sufficient to confer standing on a litigant. *Valley Forge*, 454 U.S. at 485–86, 102 S.Ct. 752. A line of cases in the Seventh Circuit Court of Appeals based on the Supreme Court's reasoning in *Valley Forge* seem to indicate that in order for an individual to have standing to challenge the public display of a religious symbol or statement, the individual would have to undertake a "special burden," or alter his or her normal routine in order to avoid the offensive object. *See e.g., Freedom From Religion Foundation v. Zielke*, 845 F.2d 1463 (7th Cir.1988); *American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265 (7th Cir.) *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986) (holding that plaintiffs' allegations that they were offended by display of a lighted cross on public property could not confer standing; but that plaintiffs had standing because they altered their behavior to avoid seeing the cross); *Harris v. City of Zion, Lake County, Illinois*, 927 F.2d 1401 (7th Cir.1991), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992) (holding that the plaintiffs efforts to avoid viewing the challenged city seal, supported by evidence, were enough to confer standing). That the plaintiffs are offended by the defendants' conduct is not enough to confer standing, the alleged injury must be "distinct and palpable," and not "abstract" or "conjectural" or "hypothetical." *City of Zion*, 927 F.2d at 1404 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "The injury brought about by a violation of law must ... affect one's possessions or bodily integrity or freedom of action ... and not just one's opinions, aspirations or ideology." *Id.* (quoting *People Organized for Welfare and Employment Rights v. Thompson*, 727 F.2d 167,

171 (7th Cir.1984)). *See also, Gonzales v. North Tp. Of Lake County, Indiana*, 4 F.3d 1412 (7th Cir.1993) (holding that the plaintiffs failed to establish taxpayer standing to challenge the presence of a crucifix in a city park, but their discontinued use of the area near the crucifix was sufficient to establish what the Court called "use and enjoyment" standing).

In *Zielke*, the plaintiffs challenged a Ten Commandments monument similar to the one at issue in the present litigation, but located in a city park. *Freedom From Religion Foundation v. Zielke*, 845 F.2d 1463 (7th Cir.1988). The plaintiffs alleged that they suffered a "rebuke to [their] religious beliefs respecting religion by virtue of being subjected to a governmental endorsement of unequivocally religious precepts and confusions." The Seventh Circuit held that the plaintiffs' claims were exactly the type of psychological harm that the Supreme Court, in *Valley Forge*, said did not confer standing on an aggrieved party. *Id.* at 1468. The court stated that, if the appellants were unwilling to go to Cameron Park because of the presence of the Ten Commandments monument, they would have adequately alleged a distinct and palpable injury because their right to the use of a public park would have been adversely affected by the presence of a possibly unconstitutional display. *Id.* at 1468 n. 3.

However, in 1994, the Seventh Circuit took a different tack in *Doe v. County of Montgomery, Illinois*, stating that it was not a requirement for standing to challenge the constitutionality of a religious message that plaintiffs undertake a "special burden" or alter their behavior in some way because of the presence of the message. 41 F.3d 1156, 1160 (7th Cir. 1994). The Court pointed to a passage in *Zielke* stating that the plaintiffs' allegation that she lived close to the offending monument was insufficient to confer standing, although in some circumstances it might suffice. *Id.* at 1469. The plaintiff in *Zielke* failed, however, because she did not

demonstrate that she lived anywhere near the park, that "the monument is visible in the course of her normal routine, or that her usual driving or walking routes take her past the park." *Id.*

The plaintiffs in *Doe* were citizens of Montgomery County, Illinois, who challenged the constitutionality of a sign over the main entrance to the county courthouse which stated, "THE WORLD NEEDS GOD." *Doe,* 41 F.3d at 1157. The Court held that the plaintiffs met the "injury" requirement for standing by alleging that they must come into direct and unwelcome contact with the city's religious message in order to participate in their local government and fulfill their legal obligations. *Id.* at 1161. The Court held that the plaintiffs' allegations of direct and unwelcome exposure to a religious message could not be distinguished from the claims of other plaintiffs that courts have found to have standing to bring claims under the establishment clause.[4] *Id.*

█ In the present case, the plaintiffs have alleged that in order to participate as citizens of Elkhart, they must come into direct and unwelcome contact with the monument, since it is by the main entrance to the Municipal Building. However, it is approximately forty-six feet from the main entrance to the building and the religious message is not visible to a person entering the building. In contrast, the sign at issue in *Doe* was directly over the door, and could not be missed. The plaintiffs also allege that they can see the monument in the course of their daily activities, when they drive or ride a bicycle past the build-

ing, or when they go downtown on other business. However, neither plaintiff alleges that they have ever altered their usual routes to avoid seeing the offending monument.

This Court finds the standing question very close on these facts, especially considering that the current Supreme Court has on more than one occasion narrowed the doctrine of standing applicable here. However, the Seventh Circuit's most recent pronouncement on the issue seems to be dispositive, even though the monument stands at a distance from the entrance to the Municipal Building, and it is conceivable that, at least before this lawsuit, a person could enter the building without noticing it. Because the plaintiffs' allegations seem to fit within the rule of *Doe v. Montgomery,* this Court finds that the scales tilt ever so slightly in favor of the Plaintiffs. Others might not resolve this standing issue in favor of these Plaintiffs, but this Court agrees with the Magistrate Judge's first recommendation, and holds that these Plaintiffs have standing to bring this suit.

## VII. DISCUSSION

Having established that the Plaintiffs have standing to bring this suit, the issue before the Court is whether the City's display of a monument on public property containing, among other things, a message that has both religious and historical significance, is prohibited by the First Amendment to the Constitution. That amendment reads, "Congress shall make

---

4. The Court observed that the "plaintiffs in *Lee v. Weisman, Wallace, Stone, Schempp, and Berger* did not assume 'special burdens' or alter their behavior because of religious conduct, yet they had standing to raise their constitutional claims." *Id.* at 1160. The Seventh Circuit cited a long list of Establishment Clause cases to support its holding in *Doe,* but most of the cited cases seem to be distinguishable on the facts because they involved some form of local taxpayer standing. Some involved challenges by municipal taxpayers, who have standing to challenge tax dollar expenditures that allegedly contribute to Es-

tablishment Clause violations. *Gonzales,* 4 F.3d at 1416 (citing *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and *Zielke,* 845 F.2d at 1470). Others involved challenges by public school students and their families, where courts have traditionally found standing based on the coercive nature of public education which makes it much more likely that students might be "subjected to unwelcome religious exercises." In addition, parents usually have taxpayer standing to challenge the use of their tax money for religious purposes.

no law respecting an establishment of religion, or prohibiting the free exercise thereof." These sixteen words, elegant in their simplicity, have engendered endless litigation as courts have attempted to find in them guidelines for the appropriate relationship between religion and the state.

█ This steady stream of litigation started in 1947 when Justice Black adopted Thomas Jefferson's metaphor for the relationship between church and state and built it into a "high and impregnable wall" of separation. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The metaphor raised more questions than it answered, and has led to the development of no less than five tests for determining when government action passes the wall and becomes a law "respecting an establishment of religion." [5] It should be pointed out that this language requires government to stop at a distance from an actual establishment of a state religion in that it forbids any government action that even tends toward the establishment of religion. However, it does not require that government extirpate every reference to religion, because that would amount to a hostility towards religion which is also prohibited. *Allegheny v. ACLU,* 492 U.S. 573, 656, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J. concurring in part and dissenting in part).

█ The first difficulty before the court in deciding on a test is determining how to characterize the Ten Commandments. It is not exactly a religious symbol, as in challenges to displays of nativity scenes and Latin crosses, because it has a message. It is not purely a religious message, though, because it has great historical and legal significance in this country. It is close to being a religious free speech issue, but not quite, because the donation of the monument to the city means that it is no longer the speech of a private actor in a

forum which the City has opened to the public. Neither is it exactly like the issue in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the only Supreme Court case dealing with the Ten Commandments, because of the factual differences between a mandate by a State legislature that every public school classroom display a copy of the Ten Commandments, and the passive acceptance by a municipality of a monument like the one in question which it displays in an inconspicuous corner of its property. In Establishment Clause analysis dealing with religious symbols and messages, context is everything.

Therefore, applying any of the Supreme Court's current tests to the issue before the Court requires an extension of current Supreme Court Establishment Clause jurisprudence. Because this Court finds that good arguments can be made for applying any one of these five tests to the facts of this case, this discussion will consider all five. Then, this Court will attempt to determine which test produces results most consistent with the intent and purpose of the First Amendment.

### A. The Historical Precedent Test

The United States Supreme Court's "Establishment Clause precedents have recognized the special relevance in this area of Justice Holmes' comment that 'a page of history is worth a volume of logic.' " *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 777 n. 33, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (quoting *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). The Supreme Court has more than once conducted a searching examination of our nation's history to bring light to disputes over the meaning and application of the Establishment and Free Exercise Clauses, at the same time

---

**5.** The possible tests include the test from *Lemon v. Kurtzman;* Justice O'Connor's endorsement test, Justice Kennedy's coercion test, the historical precedent test used in *Marsh v. Chambers,* and the religious speech in a limit-

ed public forum test used in *Capitol Square Review & Advisory Bd. v. Pinette.* These tests will be discussed individually and at length below.

assiduously avoiding any construction of "the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history...." *Walz v. Tax Commission,* 397 U.S. 664, 671, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

In 1983, the Supreme Court was faced with a challenge to the constitutionality of Nebraska's practice of opening legislative sessions with prayer led by a chaplain paid with public funds. *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). As Justice Brennan pointed out in dissent, the Court did not apply any of the formal "tests" from *Lemon* "that have traditionally structured our inquiry under the Establishment Clause," for obvious reasons: strict application of the three prongs of the *Lemon* test would require invalidation of legislative prayer. *Id.* at 796, 103 S.Ct. 3330 (Brennan, J., dissenting). Chief Justice Burger, the author of *Lemon,* writing for the majority, first noted that the opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. *Id.* at 786, 103 S.Ct. 3330. He further noted that one of the first actions of the original Congress, the same Congress that drafted the Establishment Clause,[6] was to authorize the appointment of chaplains for both houses of Congress paid for out of the public treasury, clearly indicating that the men who wrote the First Amendment did not view paid legislative chaplains and opening prayers as a violation of that Amendment. *Id.* at 788, 103 S.Ct. 3330. The Court went on to say:

> Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns. In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the first Congress—their actions reveal their intent.

*Marsh,* 463 U.S. at 790, 103 S.Ct. 3330. Even though Madison,[7] the drafter of the First Amendment, later expressed doubts concerning the chaplaincy practice, the Court held that evidence of opposition to a measure does not weaken the force of the historical argument; "indeed it fuses it with power by demonstrating that the subject was considered carefully and the action not taken thoughtlessly...." *Id.* at 791, 103 S.Ct. 3330. The Court said,

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

---

**6.** The same Congress that passed the First Amendment also re-enacted the Northwest Ordinance. The "Northwest Ordinance of 1787—which was enacted contemporaneously with the drafting of the Constitution and reenacted by the First Congress—established a bill of rights for a territory that included what is now Ohio, Indiana, Michigan, Wisconsin, and part of Minnesota." *City of Boerne v. Flores,* 521 U.S. 507, 553, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (O'Connor, J., dissenting). Article III of the Ordinance declared: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

**7.** Madison also expressed doubts about other practices. As President, he "proclaimed days of religious fasting and thanksgiving and later explained that he thought this permissible because the proclamations were 'merely recommendatory' and because the Constitution is not concerned with trifles." *American Jewish Congress v. City of Chicago,* 827 F.2d 120 (1987) (Easterbrook, J. dissenting, citing Levy, The Establishment Clause 100). "Jefferson, who refused on separationist grounds to issue thanksgiving proclamations, nonetheless signed treaties sending ministers to the Indians." *Id.*

*Id.* at 792, 103 S.Ct. 3330. The Court reasoned that "legislative prayer presents no more potential for establishment" than practices previously upheld, such as grants for higher education at religious institutions,[8] and tax exemptions for religious organizations.[9] *Id.* at 791, 103 S.Ct. 3330.

In *Lynch v. Donnelly*, Chief Justice Burger, again writing for the Court, said: "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." 465 U.S. 668, 674–75, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The Court in *Lynch* found that "[o]ur history is replete with official references to the value and invocation of divine guidance," and that this was evidenced by our national motto, "In God we Trust";[10] national holidays such as Christmas and Thanksgiving; and the mural of Moses holding the Ten Commandments in the chambers of the Supreme Court. *Id.* at 675–77, 104 S.Ct. 1355. The national motto, "In God we Trust" is prominently engraved above the speaker's dias in the chamber of the United States House of Representatives. *See County of Allegheny*, 492 U.S. at 673, 109 S.Ct. 3086. It is also engraved over the entrance to the Senate chambers. *See Engel*, 370 U.S. at 440 n. 5, 82 S.Ct. 1261.

Another practice that is deeply embedded in our history and traditions is the use of religious oaths and supplications. "This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, 'So help me God.' " *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203, 213 (1963). Every justice or judge of the United States is required by law to take an oath to faithfully and impartially discharge the duties of office "So help me God." 28 U.S.C. § 453. Justice Stewart noted in *Engel v. Vitale*, 370 U.S. 421, 446, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) that "[a]t the opening of each day's Session of this Court, we stand, while one of our officials invokes the protection of God. Since the days of John Marshall our Crier has said, 'God save the United States and this Honorable Court.' " The National Anthem,[11] and the Pledge of Allegiance contain references to God. In addition, Congress has enacted legislation providing for a National Day of Prayer, 36 U.S.C. § 119 (enacted May 11, 1950, recodified August 12, 1998), and Memorial Day as a day of prayer for permanent peace, 36 U.S.C. § 116 (enacted April 17, 1952, recodified August 12, 1998).

In summary, as Chief Justice Burger said in *Marsh*, these practices do not violate the First Amendment's Establishment Clause because they have become part of "the fabric of our society." *Marsh*, 463 U.S. at 792, 103 S.Ct. 3330.

Speaking of *Marsh* in his dissent in *Allegheny*, Justice Kennedy, writing for four justices, said

> *Marsh* stands for the proposition, not that specific practices common in 1791 are an exception to the otherwise broad sweep of the Establishment Clause, but rather that the meaning of the Clause is to be determined by reference to historical practices and understandings.

**8.** *See Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

**9.** *See Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

**10.** The constitutionality of the national motto has been upheld by three circuit courts. *See Gaylor v. United States*, 74 F.3d 214 (10th Cir.1996); *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir.) (per curiam) *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); *Aronow v. United States*, 432 F.2d 242 (9th Cir.1970). In the most recent case, the Tenth Circuit held that statutes establishing "In God we Trust" as the national motto and requiring its use on coins and on the printed currency of the United States, was constitutional under both a *Lemon* analysis and an endorsement analysis. *Gaylor*, 74 F.3d at 216–217.

**11.** The National Anthem was adopted by official act of Congress in 1931. *See* 36 U.S.C. § 170. It concludes with a reference to the national motto which says, "In God is our trust."

Whatever test [the court chooses] to apply must permit not only legitimate practices two centuries old but also any other practices with no greater potential for an establishment of religion.

*Allegheny*, 492 U.S. at 670, 109 S.Ct. 3086. This view has gained some support in lower courts, including the Seventh Circuit, but has never been adopted by a majority of the Supreme Court.

The Court now turns to an analysis of the Ten Commandments monument under the Supreme Court's decision in *Marsh*, but without the help of Justice Kennedy's interpretation of the case. If one characterizes the issue as whether the national government of the United States has a long and unbroken tradition of displaying monuments of the Ten Commandments, dating back to the time the First Amendment was drafted, the question answers itself. The practice of displaying monuments of the Ten Commandments began in the 1940's, a little over half a century ago. But maybe a more appropriate inquiry would be whether this nation has a long and unbroken tradition of acknowledging the importance of the Bible such that portions of it have become part of the "fabric of our society." The answer to this question requires a little more consideration.

The first official recognition of the importance of the Bible took place while the Colonies were still at war with England. *The Journals of the Continental Congress,* *September 11, 1777.*[12] The Continental Congress adopted a resolution to import 20,000 Bibles from Holland, Scotland, or elsewhere because they could no longer be purchased from England.[13] *Id.*

Five years later, an American printer named Aitken, at his own expense, finally produced an American version of the Bible and had it ready to print. *Journals of the Continental Congress, September 12, 1782.* The Continental Congress did not advance him any money, but they did pass the following resolution: "Whereupon, Resolved, That the United States in Congress assembled, highly approve the pious and laudable undertaking of Mr. Aitken, as subservient to the interest of religion as well as an instance of the progress of arts in this county, and being satisfied from the above report, of his care and accuracy in the execution of the work, they recommend this edition of the Bible to the inhabitants of the United States, and hereby authorize him to publish this recommendation in the manner he shall think proper." *Id.* Many of the same men who served in the Continental Congress were among those who later approved the First Amendment. These resolutions shed at least a little light on the significance of the Bible to early members of Congress.[14]

In *Stone v. Graham,* the Supreme Court said that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths ..." 449 U.S. at 41, 101

**12.** *Journals of the Continental Congress, Thursday, September 11, 1777.*

**13.** *Id.* The resolution was based on the recommendation of a committee headed by Dr. Allison, after determining it would be too expensive for the Congress to get an American version of the Bible ready for print. *Id.* The report recommended "that the use of the Bible is so universal, and its importance so great, that your committee refer to the consideration of Congress, and if Congress shall not think it expedient to order the importation of types and paper, your committee recommend that Congress will order the Committee of Commerce to import 20,000 Bibles from Holland, Scotland, or elsewhere, into the different ports of the states in the Union:" *Id.* Although the resolution passed, implementa-

tion was postponed because of the concern of the opposition over funding. *Id.* It was eventually tabled for the same reason. *Id.*

**14.** A little more light was shed by Alexis de Tocqueville writing about Americans around 1850. He said, "For Americans, the ideas of Christianity and liberty are so completely mingled that it is almost impossible for them to conceive of the one without the other ... How could society escape destruction if, when political ties are relaxed, moral ties are not tightened? And what can be done with a people master of itself if it is not subject to God?" Alexis de Tocqueville, Democracy in America, 293–94 (J.P. Mayer, ed., George Lawrence, trans. Harper Perennial 1988) (1850).

S.Ct. 192,[15] but that does not necessarily mean that the City of Elkhart must take down this monument. It is no more religious than the national motto, "In God we Trust," and no more pervasive than the presence of the motto on national coins and currency. In addition, testimony on the Ten Commandments by certified religious experts in other cases[16] involving the issue tends to establish that the Ten Commandments have now become a "part of our public life."[17] *See Suhre v. Haywood County, North Carolina,* 55 F.Supp.2d 384, 391–92 (W.D.N.C.1999); *Colorado v. Freedom From Religion Foundation,* 898 P.2d 1013, 1024 n. 17 (1995). Therefore, this Court holds that the historical precedent analysis from *Marsh v. Chambers* weighs in favor of holding that the presence of the Ten Commandments monument on city property does not violate the Establishment Clause.

## B. The Lemon test

■ The *Lemon* test was first developed by Chief Justice Burger in *Lemon v. Kurtzman,* a school case challenging the constitutionality of state aid to nonpublic schools. *Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). It requires a three part analysis for determining whether a challenged statute is permissible under the Establishment Clause: 1) the statute must have a secular purpose; 2) its primary effect must be one that neither advances nor inhibits religion; and 3) the statute must not foster an excessive entanglement with religion. *Id.* "If a statute violates any of these three principles, it must be struck down under the Establishment clause." *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). For a while, it seemed that the Court had settled on a one-size-fits-all analysis for all Establishment Clause violations. In the first twenty years after the introduction of the *Lemon* test, the Supreme Court only decided one Establishment Clause challenge without reference to *Lemon,* the case of *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), discussed above. However, discontent with the test was mounting, finally finding full expression in 1993 in Justice Scalia's stinging criticism of the test in his concurring opinion in *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 397–401, 113

**15.** When the issue of the Ten Commandments came before the Tenth Circuit for the second time in 1997, the Court discussed its earlier opinion in *Anderson,* in which it stated that the Ten Commandments is primarily secular and not religious in character. *Summum v. Callaghan,* 130 F.3d 906, 910 n. 2. (1997). The Court said, "Although we recognized the religious nature of the Ten Commandments, we also noted its 'substantial secular attributes' as a precedent legal code." *Id.* The Court observed that more recent cases, including a Supreme Court decision, cast doubt on the validity of the conclusion that the Ten Commandments is primarily secular in nature. *Id.* This does not mean that the Tenth Circuit overruled *Anderson,* as the Plaintiffs allege, simply that one of its bases is no longer sound. The rest of the analysis is still good law until expressly overruled, although not binding on this Court.

**16.** In *Colorado,* the Court cited a theology expert witness for the State, who testified that:

even though there are elements of this monument that are overtly religious, the monu-

ment can also be seen to harken back to those moral languages, those two streams that developed our sense of law, and that it is possible to construe this monument as being a monument to the fact that we as a republic are a people who pay attention to law.... I think it is possible to construe [commandments] two through ten as being examples of law that this country has observed from its very beginning.

**17.** In *Suhre,* the expert witness testified that certain portions of the Bible such as "love your neighbor," portions of Proverbs, the Beautitudes, and the Book of Romans. *Suhre,* 55 F.Supp.2d at 392. "As part of public life, the influence of such phrases is no longer dependent on one's religious views, but is 'there day by day for persons who do not believe in God, for persons who believe moderately in God, for persons who believe nothing but in God.' They influence the lives of numerous persons not as Commandments, but as a public moral statement guiding their conduct." *Id.*

S.Ct. 2141, 124 L.Ed.2d 352 (1993). Justice Scalia suggested that the secret of the *Lemon* test's survival is that it is so easy to kill. *Id.* at 398, 113 S.Ct. 2141. "When we wish to strike down a practice it forbids, we invoke it ... when we wish to uphold a practice it forbids, we ignore it entirely ... Such a docile and useful monster is worth keeping around, at least in a somnolent state; one never knows when one might need him." *Id.*

Writing in February, 1997, one commentator noted that, except for the decision in *Lamb's Chapel,* the Court's last six establishment clause cases were decided on other theories, without citation to *Lemon. See,* Michael W. McConnell,[18] "Stuck with a Lemon," 83–FEB A.B.A.J. 46. Then, in 1997, the Court once again invoked *Lemon,* this time to overrule a decision that had scarcely been on the books ten years and that involved essentially the same parties and the same practice by the State of New York. *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), *overruling Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). In *Agostini,* the Court determined that its previous decision misapplied the test in *Lemon,* and a new analysis using the three-part test reached an opposite conclusion as to the constitutionality of the state's practice. *Id.*

The problem for lower courts is that, while the Supreme Court is free to ignore precedent and try to develop a test that will best promote the underlying objectives of the Establishment Clause, they are not. In the two years between 1995 and 1997, all twelve of the federal courts of appeal, and almost all of the state supreme courts concluded that Lemon remains the constitutional standard. McConnell, "Stuck with a Lemon" at 47. "Thus they remain mired in the inconsistencies, ambiguities, and

anti-religious bias that the Court avoids by ignoring *Lemon.*" *Id.* Because the Supreme Court has never officially overruled *Lemon,* the plaintiffs' challenge to the constitutionality of the Ten Commandments monument must be run through the *Lemon* analysis.

### 1. Lemon: The Secular Purpose Prong

 The first prong of *Lemon* tells the Court that in order to be constitutional, government action must have a secular purpose. As a general rule, courts are deferential to decisions of the other branches of government and accept their stated purpose. *Edwards v. Aguillard,* 482 U.S. 578, 586–87, 107 S.Ct. 2573 (1987). Where the government asserts a secular justification for its actions, it bears the burden of producing evidence to support that justification. *Bridenbaugh v. O'Bannon,* 185 F.3d 796, 797 (citing *Metzl v. Leininger,* 57 F.3d 618 (7th Cir.1995)). A secular purpose need not be an exclusive one; it is sufficient if the government has a secular purpose. *Id.* at 800 (citing *Lynch v. Donnelly,* 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)). However, the stated purpose must be sincere and cannot be a sham. *Id.* at 801 (citing *Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573).

The Supreme Court applied the *Lemon* test in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the one case in which it directly addressed a government display of the Ten Commandments.[19] In 1981 when *Stone* was decided, the *Lemon* test reigned supreme in Establishment Clause jurisprudence. In *Stone,* the Court held that Kentucky's statute requiring every public school classroom to display a copy of the Ten Commandments violated the Establishment Clause. *Id.*

---

**18.** Michaell W. McConnell, currently Presidential Professor, University of Utah College of Law, was formerly a University of Chicago Law School Professor and of counsel at Chicago's Mayer, Brown & Platt. He has briefed or argued a number of Establishment Clause cases before the Supreme Court, and his articles have been cited on several occasions by the Seventh Circuit.

**19.** Justice Stevens also commented on the Ten Commandments in a concurring opinion in *Allegheny,* in which he was joined by Justices Brennan and Marshall.

Over a four justice dissent written by then-Justice Rehnquist, the court ruled without hearing oral arguments that the statute failed on the first prong of the test because the pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. *Id.* at 41, 101 S.Ct. 192.

The Court reached this conclusion despite a stated secular purpose by the Kentucky legislature, accepted by the Kentucky courts, that the Ten Commandments have had a significant impact on the development of secular legal codes of the Western World. *Id.* at 45, 101 S.Ct. 192. Justice Rehnquist in his dissent described this as "a cavalier summary reversal, without benefit of oral argument or briefs on the merits, of the highest court of Kentucky." *Id.* at 47, 101 S.Ct. 192. In his dissent in *Edwards*, Justice Scalia, joined by Chief Justice Rehnquist, pointed out the dangers inherent in attempting to discover, not the objective purpose of legislation as stated, but the subjective motivation of those who enacted it, and the uncertain guidance it provides to those who must determine the constitutionality of their actions.[20]

In 1995, the Colorado Supreme Court found a secular purpose for the State's display of an FOE Ten Commandments monument in the state park adjacent to the State Capitol Building. *State v. Freedom From Religion Foundation,* 898 P.2d 1013 (Colo.1995). The Court found that the State had no record of how the monument came to be in the park, but several state employees testified that the State had a neutral policy in accepting displays for the park that reflected a purpose of making the space available for a variety of groups interested in utilizing the valuable state grounds. *Id.* at 1024. The State's acceptance did not indicate a purpose to endorse the message on any of the monuments. *Id.* In the absence of direct evidence of the State's purpose, and considering the State's generally neutral policy in accepting monuments for the park, the Court concluded that acceptance of the gift by the State, without other evidence, indicated the State's assent to the FOE's stated secular purpose. *Id.* They accepted statements in an affidavit from E.J. Ruegemer, the originator of the program, that the FOE's purpose in donating the monument was entirely secular and part of an effort to promote moral standards among young people. *Id.* at 1024 n. 16. The fact that the FOE is not a religious organization weighed heavily in favor of finding that its purpose was secular. *Id.*

In the Elkhart Ten Commandments case, the Magistrate Judge recommended finding an improper religious purpose based on a determination that it serves a secular purpose today. The Magistrate Judge found that the stated purpose of the FOE was counterbalanced by religious statements made during an unveiling ceremony by several area religious leaders, as reported in local newspapers, making the issue a wash at the time the monument was donated in 1957. However, this analy-

---

20. Specifically, Justice Scalia stated:

Our cases interpreting and applying the purpose test have made such a maze of the Establishment Clause that even the most conscientious governmental officials can only guess what motives will be held unconstitutional. We have said essentially the following: Government may not act with the purpose of advancing religion, except when forced to do so by the Free Exercise Clause (which is now and then); or when eliminating existing governmental hostility to religion (which exists sometimes); or even when merely accommodating governmentally uninhibited religious practices, except that at some point (it is unclear where) intentional accommodation results in the fostering of religion, which is of course unconstitutional. But the difficulty of knowing what vitiating purpose one is looking for is as nothing compared with the difficulty of knowing how or where to find it. For while it is possible to discern the objective "purpose" of a statute (i.e., the public good at which its provisions appear to be directed), or even the formal motivation for a statute where that is explicitly set forth (as it was, to no avail, here), discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. *Edwards,* 482 U.S. at 636, 107 S.Ct. 2573.

**996**

sis begs the question whether the City of Elkhart had a secular purpose or a religious one in accepting and displaying the Ten Commandments monument. In *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Supreme Court was willing to look back almost 40 years to find an unconstitutional religious purpose for Arkansas' anti-evolution statute. However, nothing in the record reveals the purpose of the Elkhart Common Council in accepting the monument. It was donated as part of a National Youth Guidance Program, and unveiled as part of the City's Memorial Day festivities. Congress had only recently declared Memorial Day a national holiday for the purpose of praying for peace.[21] Certain religious leaders and the head of the VFW spoke at the ceremony, but none of the speakers represented the City of Elkhart.

The facts of the Elkhart case are almost identical to those in Colorado. The key evidence in determining the intent of the FOE was a copy of the same letter that is in evidence before this court written by E.J. Ruegemer, the juvenile justice judge who originated the program. This Court agrees with the reasoning of the Colorado Supreme Court, and attributes the intent of the donor to the donee, the City of Elkhart. The City's purpose, promoting morality among its youth, is a legitimate aim of government and traditionally part of the police powers of the state.

■ The record does, however, contain a statement from the Elkhart Common Council dated May 4, 1998 concerning the Ten Commandments monument, written in response to the plaintiffs request that they remove it. Since this document represents a statement by the Council of rea-

sons for keeping the monument as part of its display on the lawn of the Municipal Building, it is relevant in determining the City's current purpose. In its resolution, the City states its intention to maintain a number of exhibits on City property of cultural and historical significance, of which the Ten Commandments monument is just one. The various exhibits are described in considerable detail in the Defendant's briefs. Therefore, the Court finds that the City of Elkhart had a secular purpose originally in accepting the Ten Commandments monument, and that it has successfully stated a secular purpose for continuing to display the monument on City property.

**2. Primary Effects and Excessive Entanglement**

This section will discuss the second and third prongs together, since the Supreme Court recently collapsed the two-part analysis into one. *See Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The third prong of the *Lemon* test has been called the Catch–22 of Establishment Clause jurisprudence. For example, if a school system set up a program allowing public school teachers to teach remedial classes in parochial schools in order to make federal Title VII funds available to all students, the program had to be carefully monitored to make sure the teachers receiving public funds were not inculcating religion. *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). But, that very monitoring process created an excessive entanglement of government and religion and rendered the program unconstitutional. *Id.*

**21.** Interesting enough, both parties state in their briefs that Memorial Day is a secular holiday. However, the statute enacted by Congress in 1998 reads as follows:
The President is requested to issue each year a proclamation—
(1) calling on the people of the United States to observe Memorial Day by praying, according to their individual religious faith, for permanent peace;

(2) designating a period of time on Memorial Day during which the people may unite in prayer for a permanent peace;
(3) calling on the people of the United States to unite in prayer at that time; and
(4) calling on the media to join in observing Memorial Day and the period of prayer.
36 U.S.C. § 116 (1988).

In *Agostini,* the Supreme Court responded to this problem and tinkered once again with the *Lemon* test. *Agostini,* 521 U.S. 203, 117 S.Ct. 1997. The Court downgraded the excessive entanglement prong and made it part of the primary effects analysis, one of three criteria which the Court said it uses to evaluate whether government aid has the effect of advancing religion. *Id.* at 234, 117 S.Ct. 1997. The other two are: 1) that it does not result in governmental indoctrination, or 2) define its recipients by reference to religion. *Id.* As a separate analysis, the Court also determined that the state aid program at issue could not possibly be viewed as an endorsement of religion. *Id.* Since that analysis has taken on a life of its own under the rubric of "the endorsement test," it will be considered separately in Section VII(C) below.

In a recent case in the Seventh Circuit, the Court considered whether *Agostini* required a change in its Establishment Clause analysis. *See Bridenbaugh v. O'Bannon,* 185 F.3d 796, 797–98 (1999). The Seventh Circuit noted that in *Agostini,* the Supreme Court reaffirmed "the general principles we use to evaluate whether government aid violates the Establishment Clause." *Bridenbaugh,* 185 F.3d at 798 (quoting *Agostini,* 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). Therefore, the Seventh Circuit found that application of the test from *Lemon* remains largely unchanged. *Id.* It stated that the Court continues to ask whether the government acted with the purpose of advancing or inhibiting religion, whether the aid has the "effect" of advancing or inhibiting religion, and whether the governmental action resulted in an excessive entanglement between religion and the state. *Id.* (citing *Agostini,* 521 U.S. at 222–23, 117 S.Ct. 1997).

The plaintiff in *Bridenbaugh* challenged the constitutionality of Indiana's Good Friday holiday for State employees. *Id.* at 797. The Court held that the State met its burden of proof on the secular purpose prong by establishing that its secular justification was to provide state employees with a long weekend for a spring holiday. *Id.* at 799. The Court reasoned that the fact that the holiday coincided with a day that has religious significance for Christians did not turn its purpose into a religious one. *Id.* The Court stated that if it did, Sunday closing laws and holidays for Christmas and Thanksgiving would also have to be invalidated, practices which have been upheld by the Supreme Court. *Id.* (citing *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).

In evaluating the primary effect of the State's Good Friday holiday, the Court never mentioned the three criteria which *Agostini* suggested should be used to determine if government aid has the prohibited effect of advancing or inhibiting religion. *Agostini,* 521 U.S. at 204, 117 S.Ct. 1997. Instead, the Court held that on these facts, the plaintiffs' argument, that the principal effect of the holiday was to advance religion and represented an endorsement of religion because there was no secular justification for the Good Friday holiday, failed with his first allegation because the two arguments dovetailed. *Bridenbaugh,* 185 F.3d at 801.

The Court held that the plaintiffs' second argument, that the Good Friday holiday advances religion because it makes it easier for Christians to practice their faith by having the day off, also failed because the Supreme Court has made clear that "not every law that confers an 'indirect, remote, or incidental' benefit upon religion is for that reason invalid." *Id.* (quoting *Lynch,* 465 U.S. at 683, 104 S.Ct. 1355). The Court pointed out that no court has ever invalidated a state holiday merely because it has the indirect effect of making it easier for people to practice their faith. *Id.* at 801–02. The Court did not discuss the third prong of *Lemon* because the plaintiff did not allege that the holiday created an excessive entanglement between religion and the state. *Id.* at 798.

As in *Bridenbaugh*, the Plaintiffs in the case before this Court have devoted their brief to establishing that the City of Elkhart lacks a secular purpose, and that its placement of the Ten Commandments monument on the Municipal Building lawn has the prohibited effect of advancing religion. They do not allege that the Defendant's conduct creates an excessive entanglement with religion. Nor do the Plaintiffs mention in their brief the three factors in *Agostini* that the Supreme Court said it currently uses to evaluate whether government aid has the effect of advancing religion. Instead, they used Justice O'Connor's endorsement test to support their claims as the appropriate test to determine the constitutionality of the Defendant's actions. The reason for this is clear. The Court included as part of its primary effects analysis two requirements that do not fit in situations outside the context of government aid to religion: 1) that the government aid does not result in governmental indoctrination, and 2) that it does not define its recipients by reference to religion. *Agostini*, 521 U.S. at 204, 117 S.Ct. 1997. Although the Circuit Courts of Appeal that have addressed the viability of *Lemon* after *Agostini* agree that *Lemon* has not been overruled, only one Court has applied *Agostini* outside the context of government aid to parochial schools, and that was the Seventh Circuit in *Bridenbaugh*. As already mentioned, *Bridenbaugh* applied *Lemon*, but not the Supreme Court's newest three-part test from *Agostini*. In cases of religious symbols and messages in the public square like the case before this Court, there are no recipients and no one is being indoctrinated. People are free to read the monument or ignore it as they choose. Therefore, the Court finds that the *Lemon* test is not helpful in this case unless applied in the form of the endorsement test, as discussed in the next section.

## C. The Endorsement test

The Endorsement test is a refinement of the *Lemon* test that was first proposed by Justice O'Connor in *Lynch v. Donnelly* as a way to determine the primary effects of a government action. *Lynch*, 465 U.S. at 688, 104 S.Ct. 1355. To be constitutional under the *Lemon* test, a governmental action could not have the primary effect of either advancing or inhibiting religion. *Id.* at 691, 104 S.Ct. 1355. The majority in *Lynch* applied the *Lemon* test and based on its analysis, held that the city's inclusion of a creche as part of its overall celebration of the holiday season did not violate the Establishment Clause. *Id.* at 668, 104 S.Ct. 1355. Justice O'Connor, however, pointed out that several Supreme Court decisions had upheld government practices which had the effect of advancing religion, including *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding tax exemptions for religious, educational, and charitable organization); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960) (upholding mandatory Sunday closing laws); *and Zorach v. Clauson* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (upholding released time from school for off-campus religious instruction). She says what is crucial is that the government practice not have the effect of communicating a message of government endorsement or disapproval of religion to a reasonable observer. *Id.*

Justice O'Connor stated that she did not believe that the display of the creche communicated a message that the government intended to endorse the Christian beliefs represented by the creche. *Id.* at 692, 72 S.Ct. 679. She reasoned that, although the religious and sectarian significance of the creche was not "neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Id.* She found the government's display of the creche in the setting of a general display celebrating the Christmas holiday to be

no more an endorsement of religion than such governmental 'acknowledgments' of religion as legislative prayers of the type approved in *Marsh v. Chambers,* government declaration of Thanksgiving as a public holiday, printing 'In God We Trust' on coins, and opening court sessions with 'God save the United States and this honorable court.' Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying governmental approval of particular religions.

*Id.* at 692–93, 72 S.Ct. 679 (citations omitted).

Justice Blackmun adopted the endorsement test in *County of Allegheny v. A.C.L.U.,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), stating that Justice O'Connor's test "provides a sound analytical framework for evaluating governmental use of religious symbols." 492 U.S. at 595, 109 S.Ct. 3086. In a concurring opinion, O'Connor summarized the endorsement test, noting that the approach requires the court to judge every government practice "in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Id.* at 624–25, 109 S.Ct. 3086 (quoting *Lynch,* 465 U.S. at 694, 104 S.Ct. 1355). While noting that some government acknowledgments of religion may serve secular purposes and, because of their "history and ubiquity" do not convey a message of endorsement of particular religious beliefs, she stated that "[g]overnment practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny." *Id.* at 625, 109 S.Ct. 3086. She stated that "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are political insiders, favored members of the political community." *Id.* This violates the Establishment Clause, which "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." *Id.*

In *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 780, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), Justice O'Connor refined the endorsement approach even further. In *Capitol Square,* the Court split over the appropriate test to use. Justice Kennedy writing for four justices in the plurality opinion, used the analysis for private speech in a public forum, as discussed in Section VII(E) below. Five justices agreed that the endorsement test should be used, but came to three different conclusions as to how it should be applied and what result it would produce.

Justice O'Connor, writing for three justices in a concurring opinion, concluded that the test was an objective one that should not focus on the actual perception of individual observers. *Id.* at 779, 115 S.Ct. 2440. She said that the Court does not ask whether there is any person who could find an endorsement of religion, or whether some people may be offended by the display, or whether some reasonable person might think the State endorses religion because there are always some who reasonably might perceive a particular action as an endorsement of religion. *Id.* at 780, 115 S.Ct. 2440. Instead, according to Justice O'Connor, the "reasonable observer" in the endorsement inquiry is "deemed aware of the history and context of the community and the forum in which the religious display appears." *Id.* She stated that "the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.* (quoting *Allegheny,* 492 U.S. at 630, 109 S.Ct. 3086).

Once the reasonable observer is charged with knowledge of the history and context of the display, then the analysis begins to resemble the approach in *Marsh v. Chambers*.[22]

Cases where the Seventh Circuit has applied the endorsement test are sparse. In *Bridenbaugh,* the Court mentioned the endorsement test, but determined that *Lemon* was still the appropriate test to use. In *Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581, 595 (1995), the Court relied on recent Supreme Court forum cases and held that the placement of a menorah in the lobby of the City–County Building in Indianapolis, pursuant to a neutral policy of allowing expression on the holiday season, raised no Establishment Clause concerns of such countervailing importance as to outweigh the plaintiffs' right to free expression. Judge Ripple, writing for the Court, mentioned O'Connor's endorsement test and its sensitivity to context. *Id.* He commented on the Court's holding in *American Jewish Congress v. City of Chicago,* 827 F.2d 120 (1987), and noted that the nativity scene at issue in Chicago was unconstitutional despite disclaimer signs because it communicated "a message of government endorsement." *Id.* The centrality of location of the nativity scene in Chicago's City Hall "did not lend itself to the interpretation that it was the expression of one speaker in a forum open to all." *Id.*

In *Harris v. City of Zion, Lake County, Ill.,* 927 F.2d 1401 (7th Cir.1991), a divided three judge panel held that use of the Christian cross on a city's seal represented an unconstitutional endorsement of religion. Judge Easterbrook in dissent stated that "the first amendment, as I understand it, forbids taxation and coercion in support of religion but does not forbid the display of religious symbols." *Id.* at 1423 (citing *Allegheny County v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)) (Kennedy, J. dissenting). Judge Easterbrook observed that "Zions's seal has been in use for 89 years without stifling reli-

gious diversity or slowing the conversion of a religious enclave to a secular city." *Id.*

Judge Easterbrook also dissented in *American Jewish Congress,* 827 F.2d at 128, where he said that the endorsement test created the kind of multi-factor balancing test that "gives judges of the inferior federal courts fits." Noting that the rule requires judges to examine each symbol's context, he says the problem is in knowing which items of context matter. *Id.* at 129. "If different elements cut in different directions, what is to be done?" *Id.* Finally, he said, "It is discomfiting to think that our fundamental charter of government distinguishes between painted and white figures—a subject the parties have debated—and governs the interaction of elements of a display, thus requiring scrutiny more commonly associated with interior decorators than with the judiciary." *Id.* He argued that to hold that the City of Chicago may not use a symbol showing "the religious origin and significance of a national holiday is to extend Jefferson's 'wall of separation' metaphor beyond its proper scope." *Id.* Yet three years later, writing for two judges on a three judge panel, Judge Easterbrook stated that under the approach in *Lynch,* even a herd of reindeer and a forest of jumbo candy canes could not neutralize the effect of a Catholic mass that was to be held at a city festival honoring its Italian heritage. *Doe v. Village of Crestwood, Ill.,* 917 F.2d 1476 (1990). It seems Judge Easterbrook would find a dividing line somewhere between displaying a symbol of religious significance, and performing a religious ceremony.

Cases in other circuits dealing specifically with the Ten Commandments have looked to the context of the display in evaluating whether it gives the appearance of government endorsement of religion. *Suhre v. Haywood County, North Carolina,* 55 F.Supp.2d 384 (W.D.N.C.1999); *Harvey v. Cobb County, Georgia,* 811

---

**22.** *See Section VII(A) above.*

F.Supp. 669 (N.D.Ga.1993) (holding display of two religious texts, the Ten Commandments and the "Great Commandment" of Jesus which are of particular significance to the Christian religion, high on the wall of a courthouse, without any countervailing secular passages or symbols, violated the establishment clause); *State v. Freedom From Religion Foundation, Inc.,* 898 P.2d 1013, 1018–19 (Colo.1995) (holding *en banc* that the monuments' content, including both the language of the Ten Commandments and the surrounding symbols and instructions, and its setting among several much more prominent monuments in Lincoln Park and throughout the Capitol Complex Grounds sufficiently neutralized its religious character resulting in neither an endorsement nor a disapproval of religion).

Courts and commentators alike frequently base their analysis of the context on Justice Stevens concurring opinion in *Allegheny,* in which he discussed the frieze on the south wall of the United States Supreme Court, and in which he advocated application of a strong presumption against the public use of religious symbols. *Allegheny,* 492 U.S. at 652–53, 109 S.Ct. 3086. Justice Stevens was joined by Justice Brennan and Justice Marshall, concurring in part and dissenting in part. *Id.* at 646, 109 S.Ct. 3086. This strong presumption would prohibit a display only when its message is nonsecular when evaluated in the context in which it is presented. *Id.* Justice Stevens goes on to say

> For example, a carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law. The addition of carvings depicting Confucius and Mohammed may honor religion, or particular religions, to an extent that the First Amendment does not tolerate any more than it does "the permanent erection of a large Latin cross on the roof of city hall." Placement of secular figures such as Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall alongside these three religious leaders, however, signals respect not for great proselytizers but for great lawgivers. It would be absurd to exclude such a fitting message from a courtroom, as it would be to exclude religious paintings by Italian Renaissance masters from a public museum.

*Id.* (citations omitted). Justice Stevens dissented again in *Capitol Square,* 515 U.S. at 753, 115 S.Ct. 2440, based on his view that the Establishment Clause should be construed to require a strong presumption against the installation of unattended religious symbols on public property. He used the establishment test, but disagreed with Justice O'Connor and the two justices who joined her concurring opinion that the reasonable observer should be presumed to be familiar with the history and context of the display. *Id.* at 800, n. 5, 115 S.Ct. 2440. No justices joined him in this dissent. Therefore, this Court declines to use his "strong presumption" test and finds that his illustration is not helpful in analyzing the present case. The Magistrate Judge recommended finding that the City's Ten Commandments monument violates the Establishment Clause, citing the above text from Stevens. This single concurring opinion is far too slender a reed to compel the granting of an injunction, given the overall content of the Supreme Court's jurisprudence on the Religion Clauses of the First Amendment, especially as it pertains to inscriptions on public buildings. This is true with no disrespect intended towards the Justice or the Magistrate Judge.

 It is self-evident that if a person stands close enough to a religious symbol, it will not appear to be in the context of a larger display. The question, then, is whether a reasonable observer, familiar with the content of the Ten Commandments monument and its context, would believe that the City of Elkhart was endorsing a particular religious belief. In examining the content, the Court must consider everything on the face of the

monument and the historical and cultural importance of those items. In evaluating the context, the Court must look beyond the immediate location of the monument and determine if it is part of a larger display by the City of various items of historical and cultural importance, as the City claims. Finally, the Court must determine if the monument's location near the seat of power tips the scales towards finding that a reasonable observer might think the City is endorsing religion.

■ Regarding the content of the monument, other courts have had before them more substantial evidence as to the meaning of each of the symbols. The Colorado Supreme Court, in considering the content, found that the monument does not reproduce exactly the Ten Commandments as accepted by any particular sect. *Colorado v. Freedom From Religion Foundation,* 898 P.2d 1013, 1023 (Colo.1995). The Ruegemer affidavit confirms the FOE's intent to be nonsectarian. In addition, the monument contains various religious symbols that express a desire to include something for everyone, although as is frequently the case, it is possible that they have managed to offend everyone in the process. It includes an "all-seeing eye" inside of a pyramid, which has both a religious meaning based on the religions of ancient Egypt, and a nonsecular meaning as one of the symbols used on the one-dollar bill. *Id.* It includes two Jewish symbols, the stars of David, and a symbol used in the early Catholic Church. Besides these religious symbols, it contains an eagle and a flag, both generally accepted as patriotic symbols. Experts who testified at the Colorado trial agreed that the Commandments were expressions of universal moral standards common to all western societies and have played a large role in the development of the common law and formed a part of the moral background for the adoption of the national constitution. *Id.* Finally, the monument contains an inscription at the bottom stating that is was donated by the Fraternal Order of the Eagles.

Although the text of the Ten Commandments dominates the monument, it cannot be said that the message of the monument is exclusively religious. A neutral observer looking at the monument, presumed to have an awareness of its history, would know that the Ten Commandments has both religious and historical significance in this nation. The observer should be able to tell by looking at the monument that it attempts to acknowledge equally the significance of the major religions represented in this country at the time of its donation to the City. In addition, the observer would know that the City has included the monument as part of its overall collection of displays of historical and cultural significance. The lawn in front of the Municipal Building is small, and the City could not be expected to put all of its displays in one place. Local municipalities should be granted some latitude by the federal courts in how they arrange artistic displays in the space they have available.

The question of the monuments location near the seat of government is a more difficult one. If the City had a large park nearby where it could place the monument with others, the case would be more clear cut as it would more nearly resemble the contexts in which other courts have found identical monuments to be constitutional. *See Colorado,* 898 P.2d 1013, and *Anderson v. Salt Lake City,* 475 F.2d 29 (10th Cir.1973). However, the City has pointed to other monuments at least an equal distance from the courthouse door, with additional displays inside. The monument is not as obtrusive as the religious message "The World Needs God" directly over the courthouse door that was at issue in *Doe v. Montgomery,* which the court on remand found to be an unconstitutional endorsement of religion. *Doe v. County of Montgomery, Ill.,* 41 F.3d 1156 (1994), *on remand,* 915 F.Supp. 32 (C.D.Ill.1996). This Court holds that it is not an unconstitutional endorsement of religion for the City of Elkhart to acknowledge the importance of the Ten Commandments in the legal and moral development of this nation

by displaying this monument in its present location on the lawn of the Municipal Building.

### D. The Coercion Test

*County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), was a fractured opinion concerning the constitutionality of two separate Christmas displays, a creche in the county courthouse, and a menorah and a Christmas tree placed just outside the City–County Building. Three justices found that both displays violated the Constitution, four justice found that both were constitutional, and two justices agreed that the creche in the courthouse gave the appearance that the county endorsed Christianity, while the context of the outside display neutralized any message of endorsement. *Id.* Justice Kennedy, writing for himself, Chief Justice Rehnquist and Justices Scalia and White, expressed concern that language from the Supreme Court's Establishment Clause jurisprudence, "taken to its logical extreme, would require a relentless extirpation of all contact between government and religion." *Allegheny*, 492 U.S. at 656, 109 S.Ct. 3086. This, he says, is not the purpose of the Establishment Clause, and its history indicates that government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage. *Id.* "Rather than requiring government to avoid any action that acknowledges or aids religion, the Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society." *Id.* (citing *Lynch*, 465 U.S. at 678, 104 S.Ct. 1355, and *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). He noted the concern of Chief Justice Burger, the author of the *Lemon* test, that a strict application of the words and phrases of *Lemon* could "undermine the ultimate constitutional objective as illuminated by history.".

Justice Kennedy went on to say,

Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious. A categorical approach would install federal courts as jealous guardians of an absolute "wall of separation," sending a clear message of disapproval. In this century, as the modern administrative state expands to touch the lives of its citizens in such diverse ways and redirects their financial choices through programs of its own, it is difficult to maintain the fiction that requiring government to avoid all assistance to religion can in fairness be viewed as serving the goal of neutrality. *Id.*

Looking at previous Establishment Clause decisions, Justice Kennedy observed that there were two limiting principles that facilitated the "diligent observance of the border between accommodation and establishment." *Id.* at 659, 109 S.Ct. 3086. The first is that government may not coerce anyone to support or participate in any religion or its exercise. *Id.* The second is that government may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact "establishes a [state] religion or religious faith, or tends to do so." *Id.* (citing *Lynch*, 465 U.S. at 678, 104 S.Ct. 1355.) Justice Kennedy then concludes that these two principles, while distinct, are not unrelated, "for it would be difficult indeed to establish a religion without some measure of more or less subtle coercion, be it in the form of taxation to supply the substantial benefits that would sustain a state-established faith, direct compulsion to observance, or governmental exhortation to religiosity that amounts in fact to proselytizing." Justice Kennedy observed that the Court had without exception invalidated actions that further the interests of religion through the co-

ercive power of government. *Id.* at 660, 109 S.Ct. 3086.

For symbolic recognition or accommodation to violate the Establishment Clause, according to Justice Kennedy, would require an extreme case, like the display of a large Latin cross on the roof of city hall, which would have the effect of placing the government's weight behind an obvious effort to proselytize on behalf of a particular religion. *Id.* at 661, 109 S.Ct. 3086. "Absent coercion, the risk of infringement of religious liberty by passive or symbolic accommodation is minimal. Our cases reflect this reality by requiring a showing that the symbolic recognition or accommodation advances religion to such a degree that it actually 'establishes a religion or faith, or tends to do so.' " *Id.* at 662, 109 S.Ct. 3086 (quoting *Lynch,* 465 U.S. at 678, 104 S.Ct. 1355). Therefore, Justice Kennedy concludes, "Noncoercive government action within the realm of flexible accommodation or passive acknowledgment of existing symbols does not violate the Establishment Clause unless it benefits religion in a way more direct and more substantial than practices that are accepted in our national heritage." *Id.* at 662–63, 109 S.Ct. 3086.

In 1992, Justice Kennedy applied his coercion test in *Lee v. Weisman,* a case involving a challenge to the inclusion of school sponsored invocations and benedictions in graduation ceremonies at public schools. 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Once again the court splintered, with two concurring opinions and a four justice dissent written by Justice Scalia. Justice Kennedy writing for the majority found that because the only alternative available to students was to miss graduation ceremonies, the practice exerted psychological coercion on the students which compelled them to participate in religious exercises, something which the government cannot do. *Id.* at 599, 112 S.Ct. 2649.

Judge Easterbrook has written dissenting opinions more than once in Seventh Circuit cases to express his conclusion, similar to that of Justice Kennedy, that while the Establishment Clause of the First Amendment forbids taxation and coercion in support of religion, it does not forbid the display of religious symbols. *Harris v. City of Zion, Lake County, Illinois,* 927 F.2d 1401, 1422 (1991) (Easterbrook, J. dissenting, citing *Allegheny,* 492 U.S. at 655–79, 109 S.Ct. 3086) (Kennedy, J. dissenting), and citing his previous dissent in *American Jewish Congress v. Chicago,* 827 F.2d 120, 128–40 (7th Cir.1987).

Judge Easterbrook observed in his dissent in *American Jewish Congress,* when dealing with religious symbology, "[p]eople may venerate, disdain, or curse the icons as they please, without reward for the first or reprisal for the last. To hold that Chicago may not use a symbol showing the religious origin and significance of a national holiday is to extend Jefferson's 'wall of separation' metaphor beyond its proper scope." *Id.* at 129. Concerning religious speech, Judge Easterbrook observed that speech is not coercive; the listener may do as he likes. *Id.* at 132. "When the government expresses views in public debates, all are as free as they were before; that these views may offend some and persuade others is a political rather than a constitutional problem." *Id.* He pointed out that the government has engaged in religious speech since the founding of the Republic, and that those practices, from "In God we Trust" on the nation's money, to the Pledge of Allegiance to the declaration of national days of prayer and thanksgiving all share the common thread that no one is coerced to participate. *Id.* "The holder of a nickel need not Trust in God, no matter what the coin says, and need not contribute the nickel (or even three pence) to a church. He may labor on Christmas if he likes . . ., may 'affirm' rather than 'swear' when giving testimony and be silent while others say the Pledge of Allegiance." *Id.* (citations omitted). In sum, Judge Easterbrook stated that the government may encourage what it may not compel. *Id.; see also Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (holding

that when the government is using its spending power, it does not violate the Constitution when it chooses to fund some viewpoints and not others; specifically, when it forbids employees to use federally provided funds in a program in which abortion is advised as a method of family planning). These are very wise words, even if in dissent.

■ Applying Justice Kennedy's coercion test to the Ten Commandments monument in Elkhart, the City's display of the monument passes constitutional muster. The monument was a gift from the FOE, and Plaintiffs have not alleged that the City expends taxpayers' money in maintaining it. Any money spent on landscaping and maintenance would probably be spent whether the monument was there or not. Nor do they allege that anyone is forced to stand in front of the monument and read its religious message. In other words, the presence of the statue completely lacks the necessary element of coercion. If one accepts the view that the First Amendment's purpose was to prevent people from being coerced into contributing to religions with which they disagree, or to participate in unwelcome religious exercises, then the passive acceptance and continued display of a monument containing the Ten Commandments does not violate the Establishment Clause.

## E. The Test for Religious Speech in a Public Forum

At first glance, this test would seem not to apply to the monument in question because it was donated to the City of Elkhart and can no longer be considered the speech of private actors. However, the parties have raised the issue in their briefs, so the Court will briefly address it. *Pls' Mem. in Sup. at 23 and Pls' Reply Mem. Addressed to Def.'s New Argument Concerning Forum; and Def.'s Ans. Brief at 14.* The City contends that the current ownership of the monument should be disregarded because it was originally a gift from the FOE, and a designation on the monument clearly states this fact. Under

this analysis, the Court would have to determine if the City has created a public forum, and if requiring removal of the monument based on its religious content would be an unconstitutional discrimination based on viewpoint. The Plaintiffs contend that the public forum analysis is irrelevant because it is the City displaying the monument, not the FOE. The line is a difficult one to draw since the circumstances surrounding the presence of the monument on city property are not unlike those in *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), and in *Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581 (7th Cir.1995), except that they took place at an earlier time. In *Capitol Square,* a private organization sued the Advisory Board for refusing to issue a permit allowing them to erect a large Latin cross in the plaza next to the state capitol building. *Capitol Square,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650. First, the Supreme Court upheld the determination of both lower courts that Capital Square was a traditional public forum. *Id.* at 761, 115 S.Ct. 2440. They concluded that a line of cases involving private religious speech applied, and held that the defendant's legitimate interest in avoiding official endorsement of religion did not justify content-based regulations in a public forum. *Id.* (citing *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 396–5, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)).

In 1997, the Tenth Circuit Court of Appeals heard a case that presents an interesting twist on the controversy before this Court. In *Summum v. Callaghan,* 130 F.3d 906 (1997), the plaintiffs alleged that their constitutional rights were violated when the County denied them the right to put a monument on the courthouse lawn displaying the tenets of their religious faith. *Id.* at 911. They argued that the County had created a public forum based

on nothing more than the fact that the Ten Commandments monument[23] had stood on property owned by the county since 1971. *Id.* After reviewing recent decisions concerning public forums, including *Grossbaum* from the Seventh Circuit, the Court held that the installation of the monument by the FOE was sufficient to transform the lawn of the county courthouse into a "limited .public forum as it has more recently been defined by the Supreme Court." *Id.* at 919. The Court did not seem to find the fact that the monument had been donated to the County dispositive in its forum analysis.

In *Grossbaum,* the plaintiff brought suit after the Building Authority denied him permission to display a menorah in the lobby of the County–City Building. The Seventh Circuit held that, where the City had allowed broad access to a wide variety of public and private speakers, it had created a nonpublic forum. Therefore, the Supreme Court's holdings in *Lamb's Chapel* and *Rosenberger* applied, and required the Building Authority to have a neutral policy that allowed access to speakers regardless of the religious or non-religious nature of their message. *Grossbaum,* 63 F.3d at 595–6.

*Grossbaum* does not address the question of religious gifts, which is the problem faced by the City of Elkhart, but it does not seem in this case that the City's acceptance of the monument in 1956, at a time when the Supreme Court had just declared that we are a religious people whose institutions presuppose a Supreme Being, should turn a constitutionally permissible display of private religious speech into an unconstitutional expression of religious sentiments by the government. The City of Elkhart has chosen to keep the Ten Commandments monument as part of its general policy to display objects of cultural and historical significance. on public property. Nothing in the record indicates that the City has ever refused to accept and display an object on its property for a

content-based or discriminatory reason. Therefore, the City has met the requirement of strict neutrality for displays of private speech on public property.

## VIII. CONCLUSION

There have been times in our society when a voice from the back of the bus has raised profound questions as to where we were heading as a society. This may be a voice from the back of the judicial bus attempting to raise questions about where we are headed under the religion clauses of the First Amendment. Hopefully, this discussion will lead to a careful re-examination of precisely where we are going with our jurisprudence about religious messages and symbols on public property in the United States.

When this labyrinth of decisional law on the Religion Clauses of the First Amendment is examined in its totality, the Plaintiffs fall far short of establishing that they are entitled to an injunction in their favor. This Court is not here compelled to order the City of Elkhart to tear down this monument. It falls equally short of providing a basis for summary judgment in their favor. The Plaintiffs' Motion for Summary Judgment is hereby **DENIED.** The Defendant's Motion is **GRANTED.** Each party will bear its own costs.

**IT IS SO ORDERED.**

### EPILOGUE

We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or

---

**23.** The constitutionality of the same monument had been upheld in an earlier Tenth Circuit opinion, *Anderson v. Salt Lake City Corp.,* 475 F.2d 29 (10th Cir.1973).

cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For then it respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe.

Justice William O. Douglas, *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952).